STATE OF WISCONSIN,
Plaintiff,

v.

Earl BUTZ, Secretary, Department of Agriculture, United States of America, Washington, D. C., et al., Defendants.

Civ. A. No. 74–C–304.

United States District Court,
E. D. Wisconsin.

March 5, 1975.

Robert W. Warren, Atty. Gen., by John E. Kofron, Asst. Atty. Gen., Madison, Wis., for plaintiff.

William J. Mulligan, U. S. Atty., and Eric J. Curtis, Atty. in Charge, U. S. Dept. of Agriculture, Milwaukee, Wis., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

JOHN W. REYNOLDS, Chief Judge.

This is an action for injunctive relief arising under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4331 et seq., and the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 135 et seq., as amended. The action seeks a permanent injunction prohibiting the defendants from conducting any aerial spraying of the defoliants 2,4D and 2,4,5–T on any portion of the Nicolet or Chequamegon National Forests unless and until the defendants shall have complied with § 102 of NEPA and with certain provisions of FIFRA having to do with following herbicide label directions.

This court heard plaintiff's motion for preliminary injunction on July 30, 1974. The State of Wisconsin appeared by John E. Kofron, Assistant Attorney General, Madison. Defendants appeared by Eric J. Curtis, Regional Counsel, United States Department of Agriculture, Milwaukee, and William J. Mulligan, United States Attorney for the Eastern District of Wisconsin, Milwaukee. Each party had submitted several affidavits and numerous exhibits in support of their arguments.

After reviewing the papers on file and having heard counsel, this court granted a temporary restraining order until such time as it could file an order granting a preliminary injunction.

### FINDINGS OF FACT

1. Plaintiff State of Wisconsin is a sovereign state of the United States of America, having its principal offices at the State Capitol, Madison, Wisconsin.

2. Defendant United States Forest Service (hereinafter referred to as "Forest Service") is an agency of the United States and a branch of the United States Department of Agriculture. Defendant Earl Butz is Secretary of the United States Department of Agriculture and an officer of the United States.

Defendant John B. McGuire is Chief of the United States Department of Agriculture Forest Service and an officer of the United States. Defendant Jay H. Cravens is Regional Forester of the United States Department of Agriculture, Forest Service, Eastern Region (which includes the two National Forests located in Wisconsin, the Chequamegon and Nicolet National Forests), and is an officer of the United States. Defendant Wayne Mann is Forest Supervisor of the Chequamegon National Forest and an officer of the United States. Defendant Thomas A. Fulk is Forest Supervisor of the Nicolet National Forest and an officer of the United States. The defendants are vested with the authority over the operations of the Forest Service in the Chequamegon and Nicolet National Forests in Wisconsin.

3. The defendants propose to commence the spraying of a number of timber stands located within the Chequamegon and Nicolet National Forests in Wisconsin with the herbicides 2,4,5–T and 2,4D. The precise formulations are Dow Esteron 2,4,5 Concentrate and Dow Esteron 99 Concentrate, respectively.

4. These chemicals are potent herbicides which operate as growth hormones to induce a dramatic increase in the growth rate of herbacious and broad leaved plants, leading to their death. The Forest Service proposes to apply these chemicals to selected stands of timber within the National Forests in order to destroy various vegetative species which are competing with the spruce and red pine seedlings planted by the Forest Service.

5. The total proposed spray acreage for the Chequamegon National Forest is 1,018 acres, at sites ranging in size from 11 to 287 acres. (Defendants' Exhibit B) The 2,4D is proposed to be applied at rates of 2.5 pounds active ingredient per acre where the target species are birch, aspen, and "other less resistant species." The dosage will be a mixture of 1 pound of 2,4D plus 2.5

pounds of 2,4,5–T per acre where the target is oak and red maple. Although the Forest Service proposes to spray no closer than 150 feet from any water within the Chequamegon, four sites will, nevertheless be monitored for possible water contamination. Similar applications of herbicides were made in the Chequamegon for fiscal year 1974, but the percentage kill was poor where red maple and oak existed and barely acceptable on less resistant species. As a result, the Forest Service proposes to use higher rates of application than it had previously.

6. In the Nicolet Forest, approximately 641 acres are proposed to be sprayed with 2,4D at a rate of 2 pounds per acre, with the target vegetation being aspen, willow, tag alder, hazel, and several minor species. In addition, 21 acres of raspberries and maple are proposed to be sprayed with a mixture of 2,4D and 2,4,5–T at a rate of 3.5 pounds per acre. No herbicide is proposed to be applied closer than 100 feet from flowing streams, ponds, or lakes.

7. The defendants propose to apply a uniform spray of 8 gallons per acre of the chemicals 2,4D and 2,4,5–T, and will spray the chemical at winds up to 8 m. p. h.

8. The cost of the spray is estimated at $5.98 per acre. The anticipated gross economic benefit, exclusive of costs, is estimated to be approximately $32.00 per acre for the Chequamegon, assuming that the spray will "release" 32 additional cubic feet of timber per acre for each of the next ten years. There is no estimate provided as to the net economic benefit of the spray for the Nicolet.

9. Many of the proposed areas to be sprayed in each forest are in close proximity to private lands and to the ordinary high-water mark of navigable rivers, including the Iron River, the Cranberry River, and the Wolf River. Local residents regularly pick berries in at least some of the targeted areas. Other local residents eat fish and consume unfiltered drinking water taken directly from the nearby streams. The targeted areas themselves are the habitat for many game birds and animals. The Forest Service has made no inventory as to the precise nature of these various uses of the vicinities of the target areas, nor has the Forest Service made any inventory as to the nature of the uses to which the nearby private lands are put.

10. Defendants concluded on February 14, 1974, that an environmental impact statement is not required for the proposed spraying in the Chequamegon National Forest. A similar conclusion was reached with respect to the proposed spraying for the Nicolet National Forest on March 20, 1974. Each of these determinations was on the basis of a short statement entitled "environmental analysis report" with annexed appendices as to the general uses for the herbicides and maps of the proposed project areas. These reports and the conclusions as to the nonnecessity of an environmental impact statement were on file with the regional forest offices, but notice of their availability was not published in the Federal Register or elsewhere, and copies were never sent to the appropriate administrative officers within the Wisconsin Department of Natural Resources.

11. On October 30, 1973, the United States Forest Service filed with the Council on Environmental Quality a document entitled "The Use of Herbicides in the Eastern Region, Final Environmental Statement." This document was prepared and circulated pursuant to the requirements of the National Environmental Policy Act and described itself at page 1 as follows:

"The proposed action involves guidelines for controlling the use of registered herbicides for specific forest management activities on fifteen National Forests in the Eastern Region. Herbicide use is proposed for five management activity categories: Timber Management, Forest Roads

and Facilities, Special Use Permits, Wildlife, and Recreation."

Fourteen herbicides are discussed in this report, of which 2,4D and 2,4,5–T are included. The document consists of 73 pages of text and an additional 122 pages of comments from various federal and state agencies with respect to the draft statement.

12. The document dated October 30, 1973, makes only one limited reference to the National Forests in Wisconsin. These are on page 28, in which contamination of waters in the Chequamegon and Nicolet National Forests from 2,4D aerial spraying in 1972 are documented. Where as the report notes on page 1 that the eastern region is characterized by five more or less distinct areas, including New England, Appalachian, Midlands, Ozark, and the lake states, it makes no attempt to assess the problems that may be peculiar to the Chequamegon National Forests in the utilization of two specific herbicides for the purpose of timber management. There is no discussion of the effects of drift from aerial application of herbicides on nearby private lands, or in waters which are customarily used for drinking and fishing, or on berry crops which are customarily eaten by humans and game.

13. The proposed action will cause a significant reduction of wildlife on the affected areas, since their habitat will be destroyed.

14. The proposed action will cause a significant deterioration to the quality of the human environment by the destruction of such foods as raspberries and blueberries.

15. The proposed action will also cause a significant deterioration in the recreational value of the National Forests for hunting purposes by the destruction of the deer and other game animals which are supported by the "target" vegetation. The cumulative effect of destroying these clearings will also have an overall impact of significantly reducing wildlife habitats and recreational assets within the National Forests involved.

16. An unknown and disputed quantity of the spray materials will be lost by aerial drift.

17. There is a substantial controversy within the field of forest ecology as to the safety and/or value of aerial application of herbicides for the purpose of "releasing" pine seedlings.

18. The chemical 2,4,5–T contains as an inherent byproduct of its production the substance "TCDD." The affidavit of Drs. Norback and Allen (uncontroverted in the record at present) states that this substance is persistent when released into the environment and is one of the most potent teratogens that is known. It is relatively persistent and has an apparent ability to accumulate in food chains with ultimate toxic effects resulting therefrom. There is no level of TCDD which is known to be safe in environmental applications.

19. There is considerable scientific concern as to whether 2,4,5–T should be applied under any circumstance when alternatives exist in view of the toxicity and persistence of its residual contaminant TCDD.

20. There has been considerable and substantial public controversy as to the value and necessity of this spraying in the Chequamegon National Forest.

21. There are legitimate alternatives to the proposed spraying, including hand application of herbicides, "mechanical" defoliation, and no action at all, depending upon the density of the canopy and other factors.

22. Whereas the Forest Service stated in its document of October 30, 1973, that it would cooperate with the Wisconsin Department of Natural Resources by submitting its approval of the annual program thereto, the Forest Service never made such a submittal for these proposed sprayings.

23. The proposed spraying provides for application of both chemicals at greater wind speeds (up to 8 m. p. h.) than those recommended in the labels

for minimizing drift (less than 5 m. p. h.).

24. The defendants plan to apply 2,4D on two target species (birch and aspen) not listed on the label for Esteron 99 Concentrate and for a purpose—pine release—not listed thereon.

25. The proposed project's contemplation that 2,4D will drift into at least four water bodies is inconsistent with the label's (Esteron 99 Concentrate) direction to keep the material out of water.

26. The project taken as a whole is a major federal action which would significantly affect the quality of the human environment in the vicinity of the proposed target areas.

27. If the propoosed spraying were permitted to proceed, it would cause irreversible and irreparable environmental damage to target as well as nontarget areas which could not be restored.

28. There will be no damage to the pine seedlings, other than a slightly reduced rate of growth, if the spraying project is halted.

29. The public interest is best served if the spraying project is halted.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter. 5 U.S.C. §§ 701–706 and 42 U.S.C. § 4331 et seq.

2. There is a substantial probability that the value of the matter in controversy will exceed the jurisdictional amount.

3. The plaintiff has a reasonably good chance of ultimate success on the merits that defendants failed to comply with the mandate of § 102 of NEPA.

4. Where under NEPA a federal agency must prepare and file an Environmental Impact Statement prior to undertaking a proposed project, and where there will be irreparable environmental damage caused as a result of the project, the public interest requires the issuance of a preliminary injunction to preserve the subject matter of the controversy in its existing condition.

## ORDER

For the reasons stated above and on the basis of the entire record herein,

It is ordered that defendants, their officers, employees, agents, servants, and all other persons in concert or cooperation with them or at their direction are hereby now and in the future restrained and enjoined until further order of this court, and unless or until defendants shall have complied with § 102 of NEPA, from engaging in any aerial spraying whatsoever of the chemical 2,-4D or the chemical 2,4,5–T, or any combination thereof, on the Nicolet and Chequamegon National Forests in Wisconsin.

It is further ordered that defendants' motion for summary judgment on the ground that the action has been mooted by termination of the projects sought to be enjoined is denied as there is still a substantial case or controversy before this court.