THE HONORABLE, The Assembly, Legislature
By 1975 Assembly Resolution 34 you have requested my opinion as to the validity of a recently proposed rule of the Department of Natural Resources (DNR), providing regulations of the use of the chemical 2,4,5-T.
These regulations were proposed under the authority of sec. 29.29 (4), Stats., and constitute an amendment to existing Wis. Adm. Code Chapter NR 80 so as to include the chemical 2,4,5-T as a "limited use pesticide," which is defined in Wis. Adm. Code section NR 80.01 (4):
 "(4) `Limited use pesticide' means a pesticide which under certain conditions or usages constitutes a serious hazard to wild animals other than those it is intended to control."
Proposed section NR 80.02 prohibits the use of a limited use pesticide, unless a permit has been obtained from DNR. The rule requires an applicant to furnish a description of the area to be treated, the interval or calendar period when the treatment will be made, the number of applications, the purpose of treatment, the pesticide to be used, the method of application and the rate of *Page 127 
application. Discretion is vested with the secretary of the department or his designated agent to grant or deny the permit.
The first question is:
 "If Wis. Adm. Code Chapter NR 80 were adopted, would the department of natural resources be exceeding its statutory authority as set forth in section 29.29 (4) of the statutes?"
The answer is "no." Section 29.29 (4), Stats., grants to DNR the authority to adopt rules, after public hearing, governing the use of any pesticide which it finds is a serious hazard to wild animals other than those it is intended to control. The department made such a finding by including 2,4,5-T as a "limited use pesticide" under section NR 80.01 (4).
It appears that proper rule-making procedures were followed by DNR including public hearing and approval by the Pesticide Review Board as required by sec. 29.29 (4), Stats.
I conclude, therefore, that section NR 80 is within the scope of the authority of DNR to enact rules under sec. 29.29 (4), Stats., governing the use of pesticides which it finds is a serious hazard to wild animals other than those it is intended to control.
The second question is:
 "Was there sufficient justification and documentation to support the inclusion of 2,4,5-T on a limited use listing in Wis. Adm. Code Chapter NR 80?"
This question involves a quantitative and qualitative evaluation of technical articles and affidavits evaluated by an agency with presumed expertise in areas of law which it is required to administer. Neither the Department of Justice nor I possess the expertise necessary to make such an evaluation nor do the statutes contemplate such a role. Review of the record made at the hearings on the rules discloses that there is substantial evidence in the form of scientific opinion by independent experts, which if accepted by the administrative agency in its rule-making capacity would indeed justify the inclusion of 2,4,5-T on a limited use list in NR 80. The agency acts in a legislative capacity while making rules and is not restricted to facts in any one "record" in its decision, State ex rel. LaCrosse v. Rothwell (1964), 25 Wis.2d 228, 238, 130 N.W.2d 806. *Page 128 
In promulgating its rules, DNR made a finding of fact on a matter of substantial disagreement among experts. Resolution of conflicting opinion evidence is the function of an administrative agency, and its evaluation of scientific questions of facts are not to be lightly overturned. In Kachian v. Optometry ExaminingBoard (1969), 44 Wis.2d 1, 7, 170 N.W.2d 743, the Supreme Court set forth the basic test:
 ". . . The fact that experts disagree on the desirability of a particular standard is not necessarily a valid objection to such standard. Agreement among experts is a rare enough phenomenon in many fields. We quote with approval, and find controlling, this statement as the scope of judicial review of administrative regulations where experts divide on the issue of reasonableness:
 "`In order to set aside a regulation, it must be clearly unreasonable. If reasonable minds may well be divided on the question, the administrator must be upheld. It must be shown that no reasonable administrator would have made such a regulation and that it is so lacking in reason that it is essentially arbitrary.'"
Experts have advised DNR that these rules are reasonable and necessary. The department has in its files affidavits to this effect. In addition, two federal district courts have found the scientific concern over the environmental effects of 2,4,5-T sufficient to warrant the issuance of temporary injunctions against two applications of the substance by the United States Forest Service, pending more detailed studies of the effects in the particular applications, State of Wisconsin v. Butz (E.D. Wis. 1975), 389 F. Supp. 1065; Kelley v. Butz (W.D. Mich. 1975),404 F. Supp. 925.
I believe there is sufficient justification and documentation available to DNR to support its decision.
I am aware of the argument that the term "serious hazard" in sec. 29.29 (4), Stats., must mean "immediate" or "imminent" impairment to a community of wild animals. Such an argument, in my opinion, is unpersuasive.
The term "serious" is defined as: *Page 129 
 "Important; weighty; momentous, grave, great, as in the phrases `serious bodily harm,' `serious personal injury' . . . ." Black's Law Dictionary, Revised Fourth Edition, at 1532.
The term "hazard" is further defined as:
 ". . . A danger or risk lurking in a situation which by change or fortuity develops into an active agency of harm. . . . Exposure to the chance of loss or injury. . . ." Black's Law Dictionary, Revised Fourth Edition, at 850.
"Danger" is a synonym. Webster's Third New InternationalDictionary (1968 Unabridged), at p. 573.
Taking these definitions together, the term "serious hazard" refers to the existence of a risk of harm or danger which is nontemporary or nontransient in nature.
I therefore conclude that sec. 29.29 (4) requires nothing more than a finding that the chemicals carry with them a tangible, if not imminent, risk of serious injury to wild animals. This is consistent with the purposes of ch. 29 and ch. 144, Stats. Section 29.02 vests the title to, and the custody and protection of all wild animals, in the state ". . . for the purposes of regulating . . . and conservation thereof." Chapter 29 itself is a detailed series of regulations protecting these animals. The legislature has recognized that pesticides are among those chemicals which ". . . require special handling and disposal to protect and conserve the environment." Sec. 144.30 (10), Stats.
In Reserve Min. Co. v. Environmental Protection Agcy. (8th Cir. 1975), 514 F.2d 492, 7 ERC 1618, 1636, the 8th Circuit Court of Appeals adopted a general analysis which completely supports the basis utilized by DNR in adopting Chapter NR 80. There, the court essentially summarized the evidence as being one upon which experts disagree, and where no actual health harm had been demonstrated:
 "In assessing probabilities in this case, it cannot be said that the probability of harm is more likely than not. . . . The best that can be said is that the existence of this asbestos contaminant in air and water gives rise to a reasonable medical concern for the public health. The public's exposure *Page 130 
to asbestos fibers in air and water creates some health risk. Such a contaminant should be removed."
The court concluded that Reserve's discharge "endangers" the public health, and in so doing adopted the following definition of "endanger":
 "Case law and dictionary definition agree that `endanger' means something less than actual harm. When one is `endangered,' harm is threatened; no actual injury need ever occur."
Such an interpretation is also consistent with the basic posture of an administrative agency, which is to conserve and protect those under its jurisdiction from actual harm. See, e.g., Stateex rel. Martin v. Juneau (1941), 238 Wis. 564, 573, 300 N.W. 187:
 ". . . [The] state . . . is [not] obliged to postpone action until the health of a community is impaired or some citizen has died as a result of the pollution of the water of the state. . . ."
Therefore, I conclude that DNR had ample justification upon which to include 2,4,5-T as a limited use pesticide in its amendments to Wis. Adm. Code Chapter NR 80.
The third question is:
 "Would the adoption of Wis. Adm. Code Chapter NR 80 in its present form, without any standards, be proper; would principles of fairness and requirements of substantive due process be met? Lacking any standards or criteria, can the regulation of chemicals be considered, in effect, a banning of the chemicals?"
The answer is that the adoption of Wis. Adm. Code Chapter NR 80
in its present form has adequate standards to meet the principles of fairness and requirements of substantive due process.
I base this opinion upon the fact that section NR 80.02 (1) sets forth a number of requirements concerning information that must be furnished in applications for permits. The Wisconsin court has held that provisions such as these, specifying information that must be on the application forms, constitute sufficient standards to uphold the constitutionality of municipal zoning ordinances, Lerner v. Delavan (1930), 203 Wis. 32, 36,233 N.W. 608: *Page 131 
 ". . . It will be noticed that the ordinance requires the person applying for the permit to give his name, the place where the business is to be carried on, and an enumeration of the articles and merchandise to be handled therein. It is fairly to be implied that there was no intention to vest an arbitrary power in the council, but that the ordinance gives to the council the power, and imposes upon it the duty, to consider and exercise its discretion with reference to those factors in the junk business which have made it a proper subject for special legislation. These factors are: the type of person who proposes to engage in the business; the character of goods that he proposes to handle, and the location of the business."
This case has been favorably cited in several recent decisions,State ex rel. Humble Oil Ref. Co. v. Wahner (1964), 25 Wis.2d 1,7, 130 N.W.2d 304; State ex rel. American Oil Co. v. Bessent
(1965), 27 Wis.2d 537, 135 N.W.2d 317; Grams v. City of Cudahy
(E.D. Wis. 1964), 226 F. Supp. 385, 386.
The materials that must be submitted in the application form all clearly pertain to factors which are reasonably related to the effects of pesticides upon wild animal populations. Since such standards have been upheld as sufficient to guide the exercise of permit granting authorities, Lerner v. Delavan,supra, and the other cases cited, I conclude that the proposed amendments to section NR 80.02 meet the basic principles of fairness and requirements of substantive due process.
The fourth question is:
 "Did the material submitted to the legislative committees meet the statutory requirements of section 227.018 (2) of the statutes? Was this documentation sufficient to justify the extension of the regulation of 2,4,5-T to all agricultural uses?"
Section 227.018 (2), Stats., requires that when a revision of a rule is in final draft form, an agency shall notify members of "appropriate standing committees of the legislature," and forward with its notice a brief summary of the draft. Apparently, DNR did, in fact, so notify the legislature by forwarding a copy of the proposed revisions to Chapter NR 80 (identical in form to the final text of the rules), but failed to include a brief summary thereof. *Page 132 
Therefore, DNR did not meet the precise statutory requirements of sec. 227.018 (2) of the statutes. Judging from the legislature's response, however, I am satisfied that DNR submitted sufficient information to fulfill the spirit of the procedure set forth in the statute; to-wit, the placing of the legislature upon notice so that committees may proceed to meet with the agency to review the drafts.
I come to this conclusion because of what actually transpired after DNR's submittal of notice. First, DNR was requested by the Natural Resources committees of the two chambers to defer implementation of the rule until such time as a hearing could be had with the committees. Such a hearing was, in fact, held on June 23, 1975, before the Senate Natural Resources Committee, at which many members of the Assembly Natural Resources Committee were in attendance. Shortly thereafter, members of each committee forwarded their comments to DNR on the proposed rules.
Section 228.018 (2), Stats., is a procedural statute, with the intent of enabling committees within the legislature to provide their comments to agencies upon rules in advance of their promulgation. Since DNR's notice had precisely this effect, I must conclude that DNR's submittal substantially met the requirements of sec. 227.018 (2) in this instance.
I take into account the fact that DNR did not provide the appropriate legislative committees with any documentation in support of the proposed rule. I agree that such documentation may be desirable, insofar as it may answer in advance any questions the legislative committee may have concerning the rules. However, I find no statutory requirement that DNR submit such documentation. I must conclude, therefore, that the material submitted to the legislative committees did, in fact, meet the statutory requirements of sec. 227.018 (2), Stats., under the circumstances you state.
BCL:JEK *Page 133