**Ronald PATTERSON, Plaintiff,**

v.

**J. James EXON and William T. Coleman (formerly Claude Brinegar), Defendants.**

**Civ. No. 73-0-434.**

United States District Court,
D. Nebraska.

June 14, 1976.

■■■■■■■■■■■■■■■

James T. Gleason, Omaha, Neb., for plaintiff.

Clarence A. H. Meyer, Atty. Gen. of Neb., Lincoln, Neb., for Governor Exon.

Stephen L. Muehlberg, Asst. U. S. Atty., Omaha, Neb., for William T. Coleman, Secretary of Transportation.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This is an action to enjoin the defendants from spending any money or beginning any construction on a section of Nebraska State Highway 31 until a proper environmental impact statement has been prepared and approved. Plaintiff owns and leases property abutting the right-of-way of Highway 31 in the area of the proposed construction. The defendants are the governor of the State of Nebraska and the Secretary of the United States Department of Transportation. This matter was tried to the Court without a jury and the Court conducted a view of the section of the highway in question and the surrounding environment on December 30, 1975, pursuant to a request from all parties. Jurisdiction is present under 28 U.S.C. § 1331.

## FINDINGS OF FACT

Nebraska State Highway 31 is a state highway approximately thirty-one miles long and generally running north and south. The portion in issue here is an unpaved stretch of that highway between Interstate 80 on the north and Nebraska State Highway 50 on the south, consisting of eleven miles, more, or less. (See Appendix I.) It is the only unpaved section of the highway. For the first three miles south of I–80, Highway 31 passes through rolling farmland with cultivated fields and pastures on either side of the right-of-way. There are few trees adjacent to the right-of-way immediately south of I–80, but the trees and underbrush become thicker as the highway progresses south. About three miles south of I–80 the terrain through which Highway 31 passes becomes thickly wooded. The highway continues for about four miles through this wooded area and along the banks of the Platte River. The terrain becomes rolling farmland for approximately the last four miles until the highway intersects with Highway 50.

The above-mentioned wooded area includes some land owned by the Nebraska Game and Parks Commission, part of which is known as the Gretna Fish Hatchery and part of which is land known as the Schram Tract. The Fish Hatchery is no longer actively operated as such, but it serves as a picnic area and place for outdoor recreation. The Schram Tract was willed to the State for use as an outdoor recreation and nature study area. It is adjacent to the Fish Hatchery and tentative plans call for using the Fish Hatchery and Schram Tract as a single recreation area for 4–H camping activities such as picnicking, camping, hiking, etc. The wooded area contains a wide variety of trees and plants and it provides shelter for different types of birds and small game, such as deer, fox, rabbits and the like. There is a small lake near the right-of-way and several streams run through the area. It is an area rich in natural scenic beauty.

The portion of Highway 31 in issue is a gravel road which passes over several narrow bridges and which contains a number of sharp turns. A driver's visibility is restricted because of the sharp turns and because the trees and vegetation grow up to or near the road in some places. The road is dusty during dry weather and muddy during wet weather. During the winter snow tends to drift across the road and snow removal is hampered because of the lack of cleared places or shoulders adjacent to the roadway on which to push the snow. The area served by the highway is primarily agricultural and residential. A small housing development containing a few houses has been started adjacent to the right-of-way. The highway carries mostly local traffic with an average daily volume of two hundred sixty-five (265) vehicles. Traffic is light on weekdays but becomes heavier on weekends as people travel to the Fish Hatchery and surrounding areas for recreational purposes.

The defendants have prepared plans for the improvement of a 4.1 mile stretch of the road. It is this project that the plaintiff wishes to enjoin. The proposed project, identified as Project S–31–2(101)177, calls for a reconstruction of a section of the highway from the I–80 interchange to a point 4.1 miles south, which is about one-half mile north of the north boundary of the Fish Hatchery/Schram Tract. (See Appendix II). The reconstruction will generally follow the existing alignment of the highway, except that the new highway will deviate in such a manner as to eliminate an "S" curve. The plans also call for an existing bridge over a stream to be replaced with a concrete bridge forty (40) feet by one hundred (100) feet, along with a realignment of the channel of the stream. It should be emphasized that this project calls for a total reconstruction of the road section, not merely a widening of the existing highway. The new road will be built to a design speed of sixty-five (65) miles per hour, which is determined according to the functional classification of the road and the projected traffic volume. In order to meet these design standards it will be necessary to level and widen the roadbed, straighten curves and improve approaches to bridges. It will be necessary to acquire about forty-five (45) acres of additional right-of-way. The present right-of-way is sixty-six (66) feet and the proposed right-of-way will vary between one hundred twenty (120) feet and two hundred seventy-five (275) feet. The plans call for grading to remove all vegetation within the proposed construction limits, which area will then be seeded with grass after the construction is completed. The state intends to mow the grass within fifteen (15) feet of either side of the highway. The state estimated that about

four hundred (400) trees, some of which were infected with Dutch elm disease, would have to be removed, but the evidence at trial showed the number to be about eight hundred (800). The project will require the moving of about four hundred thousand (400,000) cubic yards of dirt and the pouring of over six thousand (6,00) cubic yards of concrete. The estimated cost of the project in 1973 was about $900,000, of which the federal government would pay seventy per cent (70%). As yet, the defendants have not begun proceedings to acquire additional right-of-way nor have they begun construction on the project.

At the time this project was being planned, the Nebraska Department of Roads was planning to improve the balance of the highway south of the project in question all the way to Highway 50. It did not intend to seek federal funds for that project, or at least for that part which crossed the Fish Hatchery and Schram Tract.

The Department of Roads conducted a study of the environmental impact of the 4.1 mile project and concluded that the project would not have a significant effect on the quality of the human environment and, consequently, an environmental impact statement was not needed. A negative declaration, which discussed the factors in this decision, was prepared and submitted to the Federal Highway Administration [FHWA] for approval. Officials of the FHWA initially recommended disapproval for the negative declaration for the reasons that, among others, the state was dividing the project into sections in order to avoid a thorough assessment of the environmental consequences of building a road through the Fish Hatchery/Schram Tract area. They noted that area might be land covered by Section 4(f) of the National Transportation Act of 1966, 49 U.S.C. § 1653(f)[1] and that

---

1. This section is identical to the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138, which reads in pertinent part:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. * * * [T]he Secretary shall not approve

any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereto, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such

the project foreclosed alternatives which could avoid Section 4(f) lands. Subsequently, the Nebraska Department of Roads voluntarily agreed to prepare an environmental impact statement for the remainder of the road before any improvement on the balance of the highway was undertaken. The FHWA then approved the negative declaration for the project in question.

## CONCLUSIONS OF LAW

There are two issues in this litigation: whether an environmental impact statement was required for the project in question and, if so, whether the negative declaration prepared by the defendants meets the statutory requirements of an impact statement.

■ The National Environmental Policy Act of 1969 [NEPA], 42 U.S.C. § 4321 *et seq.*, recognizes the need to preserve and protect the environment in a manner which will allow the most beneficial uses of our natural resources. It requires all federal agencies to fully assess and strike a balance between the benefits to be obtained from a proposed action, on the one hand, and the environmental costs on the other hand.[2] To that end it has established certain procedures which must be followed by all federal agencies. Among those procedures the federal agency must

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the pro-

posed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2).

NEPA is an "environmental full disclosure law." The environmental impact statement serves as a basis by which the agency can fully and completely evaluate the environmental consequences of the project. *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 850 (8th Cir. 1973). It also provides an accessible means by which those outside the agency can critically evaluate the agency's decision. *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 351 (8th Cir. 1972). The purpose of such a written declaration is

to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal "detailed statement" and a description of alternatives, NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.

*Calvert Cliff's Coordinating Committee v. United States Atomic Energy Commission*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971).

---

land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

**2.** It is important to note that NEPA leaves the final decision up to the legislative and executive branches. The court's function is not to

substitute its judgment as to what that delicate balance is or whether a project should be undertaken at all, but to see that the responsible agencies have fulfilled the procedural requirements established by the statutes. *Environmental Defense Fund, Inc. v. Corps of Engineers*, 470 F.2d 289, 300 (8th Cir. 1972); *Rankin v. Coleman*, 394 F.Supp. 647, 653–54 (E.D. N.C.1975).

The FHWA ultimately decided that the project was not a major federal action significantly affecting the quality of the human environment and, consequently, that an impact statement need not be prepared. Before proceeding further, this Court must determine whether and to what extent it is bound by that agency's decision. The Eighth Circuit has held that an agency's initial decision not to file an environmental impact statement should be measured in terms of its reasonableness under the circumstances. *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1319–20 (8th Cir. 1974) (*en banc*). Although the agency must be afforded some latitude in deciding whether to prepare an impact statement, the scope of this judgment is limited in that the agency's decision must be reasonable in light of the requirements and standards set by NEPA. *Wyoming Outdoor Coordinating Counsel v. Butz*, 484 F.2d 1244, 1249 (10th Cir. 1973). Under this standard of review the Court must determine "whether the agency reasonably concluded that the particular project would have no effects which would significantly degrade our environmental quality." *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (5th Cir. 1973). If the evidence shows that no environmental factor would be significantly degraded by the project, the agency's decision must be upheld; if the project may cause a significant degradation of some human environmental factor, the agency's decision must be overturned. *Id. See also City of Davis v. Coleman*, 521 F.2d 661, 673 (9th Cir. 1975). For the reasons which follow the Court finds that the FHWA's decision not to prepare an impact statement was unreasonable under the circumstances.

An environmental impact statement must be prepared for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The parties do not dispute that federal participation and funding makes this a "federal" project for purposes of NEPA. *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 16 (8th Cir. 1973); *River v. Richmond Metropolitan Authority*, 359 F.Supp. 611, 628 (E.D.Va.), *aff'd*, 481 F.2d 1280 (4th Cir. 1973). The defendants argue that an environmental impact statement was not required because, first, the project is not a "major" action and, second, it will not "significantly [affect] the quality of the human environment." Those two concepts, however, are not separate and independent. The magnitude of a project cannot be considered apart from its effect on the environment. A project which has a significant effect on the environment must be given the detailed consideration required by NEPA. *Minnesota Public Interest Research Group v. Butz, supra,* 498 F.2d at 1321–22.

The defendants rely on *Julis v. City of Cedar Rapids*, 349 F.Supp. 88 (D.Ia.1972), and *Kisner v. Butz*, 350 F.Supp. 310 (N.D. W.Va.1972), to support their position that the project is not a major action significantly affecting the quality of the human environment. But those cases differ in degree from the instant case. In *Julis* the proposed project called for street widening in a fourteen-block area of a city. In *Kisner* the project involved construction of a 4.3 mile segment of a single-lane gravel road which connected other segments of a road that had already been built. Roads similar to the segment in question had previously been constructed in the area and had not significantly affected the environment.

The project in question is not merely a resurfacing of Highway 31—it is a total reconstruction which will deviate in some places from the alignment of the existing road. Although the reconstruction will have only a minimal effect on the farmland through which the highway passes, the plans call for a modification of the channel of a stream, construction of a relatively large bridge, and considerable grading and tree removal in a wooded area through which the last mile of the project passes. That area is rich in scenic beauty and the extent of the construction, grading and clearing would seriously impair the natural

beauty of that area.[3] There was also some evidence that the project would have an adverse effect on the wildlife in the area which, in turn, would adversely affect the quality of the human environment. Under these circumstances, the Court concludes that the project would have a significant effect on the quality of the human environment and the agency's decision to the contrary was unreasonable. An environmental impact statement should have been prepared pursuant to 42 U.S.C. § 4332(2)(C).

The defendants next argue that the negative declaration in question satisfied the statutory requirements for an environmental impact statement. A sufficiency of an impact statement must be judged in terms of its reasonableness under the circumstances.

> [T]he environmental statement "to some extent must be examined in light of the particular facts and circumstances surrounding the project * * * in order to determine its sufficiency. The extent of detail required must necessarily be related to the complexity of the environmental problems created by the project." The discussion of environmental effects need not be "exhaustive" but rather need only provide sufficient information for a "reasoned choice of alternatives." (Citations omitted.)
>
> *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852 (8th Cir. 1973).

The plaintiffs have alleged numerous deficiencies in the negative declaration prepared and submitted by the defendants. It is unnecessary to consider most of these allegations because the issue which lies at the heart of the negative declaration is whether the defendants analyzed the environmental effects of construction with respect to an adequate length of highway.

■ National environmental policy requires a detailed analysis of the long-range environmental costs of proposed action and a thorough study of the available alternatives before any action is taken. Planning and building highways in a piecemeal fashion threatens to frustrate this policy by allowing a gradual, day-to-day growth without providing an adequate opportunity to assess the overall, long-term environmental effects of that growth. *Indian Lookout Alliance v. Volpe, supra; Appalachian Mountain Club v. Brinegar,* 394 F.Supp. 105, 114 (D.N.H.1975); *Daly v. Volpe,* 376 F.Supp. 987 (W.D.Wash.1974), *aff'd,* 514 F.2d 1106 (9th Cir. 1975); *Conservation Society of Southern Vermont v. Secretary of Transportation,* 362 F.Supp. 627 (D.Vt. 1973), *aff'd,* 508 F.2d 927 (2d Cir. 1974); *vacated,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Sierra Club v. Volpe,* 351 F.Supp. 1002 (N.D.Cal.1972); *Thompson v. Fugate,* 347 F.Supp. 120 (E.D.Va.1972); *Committee to Stop Route 7 v. Volpe,* 346 F.Supp. 731 (D.Conn.1972). In many instances, construction of one segment will affect more than just the immediate area, through which that segment is built. It may cause an increase in traffic through another area. *Appalachian Mountain Club v. Brinegar, supra,* 394 F.Supp. at 115. Placement of one highway segment tends to limit the range of alternatives for placement of succeeding segments. *Committee to Stop Route 7, supra,* 346 F.Supp. at 740. As a practical matter, commitment of resources in one section tends to make further construction more likely. *Named Individual Members of San Antonio Conservation Society v. Texas Highway Department,* 446 F.2d 1013, 1023 (5th Cir. 1971). This is not to say, however, that NEPA forbids highway planners from dividing construction programs into sections for purposes of planning and financing. In order to effectively provide for an orderly program of highway improvement, planners must be allowed to divide highway systems into workable units.

---

**3.** This situation appears to fall within the FHWA's own administrative guidelines calling for an impact statement. Policy and Procedure Manual, 90–1 (1972) [hereafter cited as PPM 90–1], Appendix F, reads in part:

> 3. Any of the following highway sections should ordinarily be considered as significantly affecting the quality of the human environment.
>
> a) A highway section that is likely to have a significantly adverse impact on natural ecological, cultural or scenic resources of national, State or local significance.

The FHWA and the courts have recognized, on one hand, the planners' need to divide highway programs into workable segments and, on the other hand, the dangers to environmental planning that this creates. In order to reconcile these competing considerations, they have developed guidelines for determining whether the impact statement considers a proper segment of road for purposes of environmental planning. The administrative guidelines [4] of the FHWA provide:

The highway section included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope. *Piecemealing proposed highway improvements in separate environmental statements should be avoided.* If possible, the highway section should be of a substantial length that would normally be included in a multi-year highway improvement program. (Emphasis added.)

Paragraph 6, PPM 90–1.

"Highway section" is defined as

a substantial length of highway between logical termini (major crossroads, population centers, major traffic generators, or similar major highway control elements) as normally included in a single location study.

Paragraph 3a, PPM 90–1.

■ The Courts have considered three criteria in deciding whether the environmental impact statement considers a proper length of highway: (1) whether the segment connects logical termini; (2) whether the segment has an independent utility; (3) whether the length of the section assures an adequate opportunity for consideration of the alternatives to the proposed action (both whether and where to build). *Daly v. Volpe, supra; River v. Richmond Metropolitan Authority*, 359 F.Supp. 611, 635 (E.D. Va.), aff'd, 481 F.2d 1280 (4th Cir. 1973). *See also Sierra Club v. Froehlke, supra*, which focused on the independence of the

project in question. The Eighth Circuit has stated:

[T]he minimum length of state highway projects that are supported in part by federal funds must be extended to embrace projects of a nature and length that are supportable by logical termini at each end. * * * Segments that fit into an overall highway plan should be as large as is feasible under present construction and financing practices and at least be independently supportable by meaningful terminal points. However, an impact statement can be more extensive than the proposed project.

*Indian Lookout Alliance v. Volpe*, 484 F.2d at 19.

■ The proposed project does not connect logical termini nor does it have an independent utility. The northern terminus, which is the intersection with Interstate 80, is a logical terminus. *Indian Lookout Alliance v. Volpe, supra*, 484 F.2d at 19. The southern terminus is literally in the middle of the woods—there are no access roads, population areas or other traffic generators at that point. It is not a logical place for beginning or ending a road. Upon reaching the southern terminus for the project, southbound traffic will have no place to go except to continue along the unimproved portion of the road. The project in question is completely dependent upon the balance of Highway 31. The fact that the state plans to improve the balance of that road further convinces this Court that the project does not have a utility independent of the remainder of Highway 31. *Indian Lookout Alliance, supra*, 484 F.2d at 19–20. Nor was this division at the southern terminus required by geographical differences in the terrain or varying traffic needs of the two areas. *Compare River v. Richmond Metropolitan Authority, supra*, 359 F.Supp. at 635; *Citizens for Mass Transit against Freeways v. Brinegar*, 357 F.Supp. 1269, 1283–84 (D.Ariz.1973).

---

4. These guidelines are entitled to substantial weight in determining whether there has been compliance with NEPA. *Sierra Club v. Froehlke*, 534 F.2d 1289 at 1294 n. 17 (8th Cir., 1976); *Indian Lookout Alliance v. Volpe, supra*, 484 F.2d at 18.

This 4.1 mile segment does not provide officials with a proper opportunity to adequately consider alternatives to the project. In order to identify alternatives and bring them into proper prospective it is necessary to look at the overall objectives to be achieved by the project. If a project is intended to connect two roads, the length of the highway considered in that statement should be large enough to give the planners an opportunity to consider all the alternative routes that would connect those two roads, or the alternative of not building at all. At the same time, the segment does not have to be so long that it overlooks one of the major objectives of the proposal. *Committee to Stop Route 7 v. Volpe, supra,* 346 F.Supp. at 740. The evidence persuades this Court that the state's objective was to improve all of Highway 31 between I–80 and Highway 50, and that this project, having a southern terminus which is not meaningful, was only the first step toward that goal. This 4.1 mile section is obviously too small to permit the defendants to meaningfully consider alternatives which would achieve the same objective. For example, there might be alternative routes between I–80 and Highway 50 which would avoid the Fish Hatchery/Schram Tract area altogether, or at least minimize the intrusion in that area. The defendants, however, could not consider that possibility by looking at only a 4.1 mile section of the road.

The Court, therefore, concludes that this 4.1 mile section was not an appropriate segment to be the subject of an environmental impact statement. The division of Highway 31 at the proposed southern terminus for purposes of environmental planning was artificial and arbitrary. A number of courts have held that an environmental impact statement should be broader than the construction limits of the project in question. *Indian Lookout Alliance, supra; Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra; Appalachian Mountain Club v. Brinegar, supra; Committee to Stop Route 7 v. Volpe, supra.* With further construction planned for the balance of the road, including land which might be covered by Section 4(f), the defendants should have considered the environmental consequences of that construction before beginning any work on the 4.1 mile segment. This holding, of course, does not purport to tell the state and federal highway authorities how large the actual construction project must be. It merely requires them to follow the applicable federal statutes by making a long-range environmental assessment before beginning any construction.

■ The fact that the Department of Roads has voluntarily agreed to prepare a complete statement on the environmental effect of improvement of the remainder of the road before that improvement is begun does not redeem the defendants. That statement may well come too late. Placement of one segment narrows the range of choices for placement of the remaining highway sections. *Committee to Stop Route 7 v. Volpe, supra,* 346 F.Supp. at 740. With a paved highway leading up to the boundaries of the Fish Hatchery/Schram Tract, further construction through that area would be almost inevitable or, at least, any meaningful consideration of alternatives would be drastically limited. *Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, supra,* 446 F.2d at 1023. Construction through that area could be too easily justified on the basis of previous commitment of resources in the completion of the 4.1 mile section leading to that area. *Appalachian Mountain Club v. Brinegar, supra,* 394 F.Supp. at 117–119. NEPA was intended to provide a meaningful assessment of environmental factors *before* the bureaucratic juggernaut of highway construction began moving.

The concept of [NEPA] was that responsible officials would think about environment *before* a significant project was launched; that what would be assessed was a *proposed* action, not a fait accompli; that alternatives to such action would be seriously canvassed and assayed; and that any irreversible effects of the proposed action would be identified. (Emphasis in original.)

*City of Boston v. Volpe,* 464 F.2d 254, 257 (1st Cir. 1972).

To allow the defendants to postpone meaningful consideration of the environmental factors until after the project in question has been completed would totally frustrate that policy. *See also Arlington Coalition of Transportation v. Volpe,* 458 F.2d 1323, 1332–34 (4th Cir. 1972); *Chelsea Neighborhood Association v. U. S. Postal Service,* 389 F.Supp. 1171, 1181–83 (S.D.N.Y.), *aff'd,* 516 F.2d 378 (2d Cir. 1975). *Cf. Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 156 U.S.App. D.C. 395, 481 F.2d 1079 (1973).

The defendants' failure to consider an adequate section of road is a fundamental defect which violates the language and spirit of NEPA. The foundation for a proper environmental study is an adequate section of highway. Consideration of an improper segment distorts the agency's ability to correctly analyze the situation. Unless the defendants have viewed the proposed construction in the proper prospective, they are not in a position to make an informed evaluation of the environmental consequences of the action and the available alternatives. Without such an evaluation, it is impossible to tell whether the decision to go ahead with the project is reasonable or arbitrary.

In conclusion, the Court finds that construction of the 4.1 mile project in question, without a proper environmental impact statement, is likely to cause irreparable injury and that the defendants should be enjoined from taking such action pending the completion of a proper environmental impact statement. None of the parties have requested this Court to retain jurisdiction of this matter until such an impact statement has been completed and, indeed, such a course would be unwise and unnecessary under these circumstances.

A separate order will be entered granting plaintiff the relief requested.

Appendix I to follow

## APPENDIX I

Appendix II to follow

APPENDIX II