WISCONSIN'S ENVIRONMENTAL DECADE, INC., Petitioner-Appellant, v. DEPARTMENT OF NATURAL RESOURCES, Respondent: SEWERAGE COMMISSION OF CITY OF MILWAUKEE, and another, Intervenor-Respondents.†

Court of Appeals

*No. 79–611. Argued August 30, 1979.—Decided December 20, 1979.*
(Also reported in 288 N.W.2d 168.)

† Petition to review denied.

For the petitioner-appellant there were briefs by *Kathleen M. Falk* of Madison, and oral argument by *Kathleen M. Falk.*

For the respondent there was a brief by *Bronson C. La Follette,* attorney general, and *Linda H. Bochert,* assistant attorney general, and oral argument by *Linda H. Bochert.*

For the intervenor-respondents there was a brief by *Michael J. McCabe* and *Richard J. Solomon* of Milwaukee, and oral argument by *Richard J. Solomon.*

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

GARTZKE, P.J.   This appeal involves the propriety of a finding by the Department of Natural Resources (DNR) that a proposed sewer interceptor is not a major action significantly affecting the quality of the human environment.  The Metropolitan Sewerage District of the

County and City of Milwaukee (District) filed an application with the DNR for approval of the interceptor. The circuit court affirmed the DNR's order of July 14, 1978 approving the project in an action brought by the Wisconsin Environmental Decade (Decade) challenging the order. The Decade has appealed. We affirm.

The Wisconsin Environmental Policy Act (WEPA), ch. 274, Laws of 1971, created sec. 1.11, Stats.[1] Section 1.11 (2) (c) requires a state agency to prepare an environmental impact statement (EIS) if a proposed action is a major action significantly affecting the quality of the human environment. Sewer projects must be approved by the DNR under sec. 144.04, Stats. The DNR must therefore comply with WEPA before acting on a sewer project. Section 1.11 (2) (c) requires a determination as to whether an EIS is needed. Determination of the need for an EIS is made through an environmental impact as-

---

[1] Section 1.11 (2) (c), Stats., provides:

All agencies of the state shall:

(c) Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment, a detailed statement, substantially following the guidelines issued by the United States council on environmental quality under P.L. 91–190, 42 U.S.C. 4331, by the responsible official on:

1. The environmental impact of the proposed action;

2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;

3. Alternatives to the proposed action;

4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal.

sessment which utilizes a screening worksheet prepared by the staff of the DNR.[2]

The DNR did not prepare an EIS as to the sewer project because it concluded that the proposed sewer interceptor is not a major action significantly affecting the quality of the human environment.

*Wis. Environmental Decade v. Pub. Service Comm.*, 79 Wis.2d 409, 419, 256 N.W.2d 149, 155 (1977), referred to as *WED III*,[3] emphasizes that:

[T]he threshold decision whether to prepare an EIS occupies a critical position within the context of WEPA's operation. A negative determination at the initial stage may eliminate to a significant degree environmental consideration by the agency and may curtail much of the input, which an EIS is designed to foster, of other governmental agencies and the public in the agency's decision process. It is obvious that achievement of WEPA's goals will be significantly compromised if ill-advised determinations not to prepare an EIS are permitted by the courts to stand. Thus a consideration of the manner in which WEPA was intended to function dictates a liberal approach to the threshold decision of whether the impact statement should be prepared.

*WED III* holds that if the agency decides that an EIS should not be prepared, the judicial test upon review of that decision encompasses two questions:

First, has the agency developed a reviewable record reflecting a preliminary factual investigation covering the

[2] Section NR 150, Wis. Adm. Code, entitled "Environmental Impact Statement Procedures and Preparation Fees" describes the present procedures followed by the DNR in the implementation of sec. 1.11, Stats., and other statutes, including the evaluation of proposed actions in the preparation and review of environmental impact statements.

[3] *WED I* is *Wisconsin's Environmental Decade, Inc. v. PSC*, 69 Wis.2d 1, 230 N.W.2d 243 (1975). *WED II* is *Wisconsin's Environmental Decade v. Public Service Comm.*, 79 Wis.2d 161, 255 N.W.2d 917 (1977).

relevant areas of environmental concern in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the action proposed; second, giving due regard to the agency's expertise where it appears actually to have been applied, does the agency's determination that the action is not a major action significantly affecting the quality of the human environment follow from the results of the agency's investigation in a manner consistent with the exercise of reasonable judgment by an agency committed to compliance with WEPA's obligations? 79 Wis.2d 409, 425, 256 N.W.2d 149, 158 (footnote omitted).

The issue before us is limited to the first test in *WED III*: whether the DNR developed a reviewable record covering the relevant areas of the environmental concern.

The DNR's decision not to prepare an EIS was based upon an analysis of the environmental impact of the *specific* sewer interceptor[4] described in the application. The Decade challenges the decision on grounds that the DNR has purposely divided a single proposed interceptor into two parts: an environmentally insignificant part which is embraced by the application subject to the appeal before us and an environmentally significant part embraced by another application. The Decade contends that in making its threshold decision whether to prepare an EIS, the DNR should have taken both parts into account, and as the part not included in the application is environmentally significant, an EIS covering both parts should have been prepared.

Both parts were in fact covered by a single application filed with the DNR April 8, 1977 for a 9,561-foot interceptor running from the existing line in the Milwaukee

---

[4] There are four kinds of sewer projects: sewer laterals (pipes that connect an individual building to a sewer extension in front of a street), sewer extensions (which transport sewage from individual buildings to a larger collection sewer called an interceptor), sewer interceptors (which collect sewage from extensions and transport it to a central plant), and treatment plants.

area northwesterly through Hales Corners to the Milwaukee-Waukesha County line. The City of New Berlin in Waukesha County was envisioned as ultimately connecting its system with the interceptor at the county line. The DNR approved that application June 7, 1977 without an EIS or an explanation for not having done so. The circuit court, upon review of that matter in an action brought by the Decade, remanded the application to the DNR in December 1977 in light of *WED III*. The court directed the DNR to make a determination as to whether an EIS should be prepared and to produce a reviewable record of the reasons for its determination, should it be negative. The DNR took no action on the remand.

July 11, 1978 an application was filed with the DNR which resulted in the order involved in this appeal.[5] The application was revised only in that the interceptor for which approval was sought terminates in Hales Corners and is 6,393 feet long. A 2,168-foot interceptor from Hales Corners to the county line is or will be the subject of a separate application to the DNR, according to information in the DNR's worksheet.

## A. *Failure To Comply With Circuit Court Remand*

The Decade contends that the purposes of WEPA will be frustrated if when an agency is caught violating WEPA in its consideration of a project it may subse-

---

[5] The screening worksheet contains a revised application to the DNR for a shortened sewer, dated October 7, 1977. The letter of enclosure states, "This portion of the project plus the portion omitted by this revision were approved by your approval No. 77–546 dated June 7, 1977." That application was returned to the District May 15, 1978, apparently because of problems in acting upon the application within the time allowed by sec. 144.04, Stats. The application was resubmitted July 11, 1978. That the July 1978 application covers the same project as the October 1977 application is indicated by a letter of May 15 (attached to the petition to review), stating that resubmission of the plans and specifi-

quently divide the project into segments rather than follow the mandate of a reviewing court.

The purposes of WEPA are basically twofold. First, the Act is designed to ensure adequate consideration of environmental factors in the decision-making processes of state agencies before resources are irreversibly and irretrievably committed. Hanson, *Agency Decisionmaking Under The Wisconsin Environmental Policy Act*, 1977 Wis. L. Rev. 111, 115–17. "The evident purpose of WEPA was to effect an across-the-board adjustment of priorities in the decision-making processes of agencies of state government." *WED III*, 79 Wis.2d 409, 416, 256 N.W.2d 149, 153. Second, the Act is designed to get information on proposed actions before the public and other state agencies. Hanson, *supra* at 117, 121. In this respect, WEPA's model Act, the National Environmental Protection Act (NEPA), 42 U.S.C. secs. 4321 *et seq.*, has been called, "an environmental full disclosure law." *Environmental Defense Fund v. Corp of Engineers*, 325 F. Supp. 749, 759 (E.D. Ark. 1971), *injunction vacated and case dismissed*, 342 F. Supp. 1211, *aff'd*. 470 F.2d 289 (8th Cir. 1972), *cert. den*. 412 U.S. 931 (1973).

It is unclear whether the remanded application was formally withdrawn by the District but both the District and the DNR have treated that application as having been superseded by the revised application first filed in October 1977 and refiled in July 1978. (See footnote 5.)

An agency to which an application is made is generally bound by the scope of the application before it. If an application which was the subject of judicial review is no longer before the agency, either through withdrawal or

cations would be unnecessary, by the fact that the worksheet was completed May 4, 1978, and by the fact that the DNR approved the application July 14, 1978, only three days after it was "filed."

supersedence, no reason exists for further action on the application.

Failure by the DNR to comply with the remand of the circuit court, standing alone, therefore does not require that we set aside the action of the DNR.

## B. *Effect Of Possible Attempt To Avoid Compliance*

Although an agency to which an application is made can normally act only upon the application before it, that limitation must not be used to avoid the mandate of WEPA. "[C]ompliance with WEPA to the fullest possible extent is not excused merely by considerations of administrative difficulty, expense or delay." *WED III*, 79 Wis.2d 409, 438, 256 N.W.2d 149, 164. Consequently, administrative convenience or connivance by or with an applicant cannot be used to sidestep compliance with WEPA.

Compliance with WEPA at the threshold decision stage requires a good faith determination as to whether a proposed act is a major action significantly affecting the quality of the human environment. One of the criteria which must be considered when making that determination is as follows:

Stimulation of secondary effects. Even if the action itself has minimal or no direct environmental effects, if its nature is to stimulate or induce significant, secondary effects—such as major new developments encouraged by new highways or sewer extensions—the need for an impact statement is increased. Secondary effects may often be even more substantial than the primary effects of the original action. *Revised Guidelines for the Implementation of the Wisconsin Environmental Policy Act*, I(5) (B) at 3, issued by Governor's Executive Order No. 26, February 1976.

Section 1.11(2) (c), Stats., of WEPA itself requires that agencies follow the guidelines issued by the United

States Council on Environmental Quality under P.L. 91–190, 42 U.S.C. 4331, now set forth in 40 C.F.R. Part 1500. Section 1500.6(d)(1) of those guidelines provides that when identifying major actions significantly affecting the environment, "Agencies should give careful attention to identifying and defining the purpose and scope of the action which would most appropriately serve as the subject of the [EIS]" and, "In many cases, broad program statements will be required in order to assess the . . . overall impact of a large-scale program or chain of contemplated projects (e.g., major lengths of highway as opposed to small segments)."

Thus, administrative agencies must not preordain that an EIS is unnecessary through the device of artifically dividing a project; and if an agency attempts to do so, the attempt will be ignored.

The fact that the attempt was made, however, will not be ignored. Action which suggests that an agency has compartmentalized a project so as to avoid the requirements of WEPA is support for a charge that the agency has failed to comply with the Act. That conclusion was reached in *River v. Richmond Metropolitan Authority*, 359 F. Supp. 611, 635 (E.D. Va. 1973), *aff'd. per curiam* 481 F.2d 1280 (4th Cir. 1973), with respect to compliance with NEPA.

The DNR screening worksheet contains evidence suggesting that an effort may have been made to avoid compliance with WEPA as to the 9,561 foot interceptor. One exhibit appended to the worksheet is a letter by the District's engineering director to the DNR in January 1978. The letter states that the revised project was terminated at Hales Corners "as requested by your agency and the U. S. Environmental Protection Agency," and, "If it is absolutely necessary for project approval, the District will accept termination of the project at the physical connection to the existing treatment plant."

*WED III* noted that "an agency called upon to make the threshold decision about the need for an EIS under WEPA may very well approach the question with a bias favoring a negative conclusion." 79 Wis.2d 409, 420, 256 N.W.2d 149, 155 (footnote omitted). If there is evidence, as here, that such a bias is not only possible but may have resulted in an attempt to avoid compliance, a reviewing court should approach the agency's threshold decision with skepticism.

## C. *Existence Of Project To Serve New Berlin*

The District states that until it determines when and how it will service New Berlin, the DNR cannot speculate as to the environmental effects of an extension of the interceptor beyond Hales Corners. The District states on brief that extension of the interceptor from Hales Corners to the county line is but one of five described methods of providing service to New Berlin. The District argues that WEPA does not require a threshold decision regarding preparation of an EIS on a project which is not in existence.

The nature of our review and the record on appeal compels us to reject the District's factual assertions as to other methods of serving New Berlin. *WED III,* 79 Wis. 2d 409, 424–25, holds that we must determine whether the agency has prepared a reviewable record of its investigation covering the relevant areas of environmental concern and, if so, whether the threshold decision not to prepare an EIS follows from the results of the investigation.

The record prepared by the DNR consists of its screening worksheet. We are bound by that record on appeal. It cannot be enlarged by material which has not been ordered incorporated in it. *State ex rel. Wolf v. Town of Lisbon,* 75 Wis.2d 152, 155–56, 248 N.W.2d 450 (1977);

*Schimke v. Milwaukee & Suburban Transp. Corp.*, 34 Wis. 2d 317, 320, 149 N.W.2d 659 (1967) ; *Ramminger v. State Highway Comm.*, 22 Wis.2d 194, 196, 125 N.W.2d 406 (1963). As the record contains no reference to the other four methods of serving New Berlin, we cannot consider the District's description of other methods.

The District relies upon *Conservation Soc. of So. Vt. v. Secretary of Tran.*, 531 F.2d 637 (2d Cir. 1976), in support of the proposition that we cannot consider a project which the District says does not exist. *Conservation Soc. of So. Vt.* involved the question whether a twenty-mile segment of a 280-mile highway was an impermissible division of a project under NEPA. A federal district court had held that an overall EIS was necessary for the entire highway where federal officials had knowledge of overall planning by state officials, even though no overall federal plan existed. The United States Court of Appeals affirmed that decision, 508 F.2d 927 (2d Cir. 1974), but the Supreme Court vacated the judgment, *sub. nom. Coleman v. Conservation Society of Southern Vermont*, 423 U.S. 809 (1975), and remanded to the court of appeals for further consideration partly in light of *Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289 (1975).

On remand, the circuit court of appeals reviewed its prior decision and that of the district court, stating:

The Supreme Court remand here cites *SCRAP, supra*, which holds that a federal agency must prepare its EIS at "the time at which it makes a recommendation or report on a *proposal* for federal action." 422 U.S. at 320, 95 S. Ct. at 2356, 45 L. Ed.2d 215 (emphasis in original). Here the findings of the district court were that, although federal officials had knowledge of the overall planning process of state officials, there was "no overall federal plan" for improving the corridor into a superhighway. 362 F. Supp. at 636. The federal action being taken here relates only to the twenty-mile stretch between Bennington and Manchester in Vermont. The stretch is "admittedly a project with local utility," 508 F.2d at 935.

Hence we see no irreversible or irretrievable commitment of federal funds for the entire corridor and under *SCRAP* no obligation for a corridor EIS. See *Friends of the Earth v. Coleman,* 513 F.2d 295, 299–300 (9th Cir. 1975) ; *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283–85 (9th Cir. 1974). 531 F.2d 637, 639–40 (2d Cir. 1976).

*SCRAP, supra,* held that the earliest time an EIS is required by NEPA is when a "proposal" has been made. The issue in *Kleppe v. Sierra Club,* 427 U.S. 390 (1976), was whether an EIS was required as to the development of coal reserves on federal land in the entire northern Great Plains region rather than a part of the region. There was no "proposal" for an action of regional scope but the federal agencies contemplated a regional plan. The Supreme Court held that a regional EIS was not required because there was no "proposal" before the agency. *Id.* at 400–01.

We find no definitions of "proposal" in *SCRAP* or *Kleppe.* We do not, however, read either decision to equate a "proposal" with a formal statement of commitment to planned future action. Something more than a mere possibility and less than a commitment is necessary to require the determination whether an EIS is necessary. Locating the middle ground involves reasonable forecasting. *WED III* rejected an agency claim that environmental analysis of utility ratemaking would be so speculative as to render an EIS meaningless. The court in *WED III* commented as to that argument, "The need for a reviewable record disclosing an adequate factual investigation of environmental effects remains. So too does the need for reasonable forecasting and speculation . . . ." 79 Wis.2d 409, 433, 256 N.W.2d 149, 161.

The worksheet does not flatly state that definite plans exist to extend the sewer, as originally proposed, to the county line. It implies that no application for such an extension is before the DNR. The worksheet nevertheless contains statements from which it can be inferred

that an extension from Hales Corners to some point on the county line to serve New Berlin, while not a certainty, is likely in the reasonably foreseeable future.

According to the worksheet, a secondary effect of the extension to Hales Corners "would be" construction to the county line and, "The impact or affect [sic] of this action . . . will be the subject of an environmental impact statement being prepared under the direction of the DNR and the U. S. EPA." "The proposal to extend the 60-inch sewer from the Hales Corners treatment plant to the Waukesha-Milwaukee County line to provide sewer service for the City of New Berlin in the future will result in more intensive development since soil limitations restrict current development on septic tanks." "Completion of subsequent stages will provide for the abandonment of the Regal Manors wastewater treatment facility located in the City of New Berlin." "The location at which the proposed sewer will meet the Milwaukee County line for eventual service to the City of New Berlin has also been established. The City of New Berlin has requested a 54″ sewer outlet at W. Grange Avenue and the county line." "The proposed sewer has been sized at 60 inches, just slightly larger than the connection to New Berlin at the county line."

Regardless of the formal status of interceptor service for New Berlin, the worksheet shows that such an extension may be reasonably forecast from Hales Corners to some point to serve New Berlin. The worksheet shows that an extension is sufficiently definite that its environmental impact could now be considered when determining whether an EIS should be prepared.

## D.  *Scope Of Threshold Decision*

That the future installation is sufficiently definite to permit its present consideration does not automatically make such consideration mandatory.

The question is whether the DNR has impermissibly limited the scope of its investigation in deciding if an EIS shall be prepared. The issue turns on the reasonableness of the chosen scope of the investigation.

The District urges that we adopt the approach of *Homeowners Ass'n, etc. v. Costle*, 468 F. Supp 405 (W.D. Ky. 1979). *Homeowners* is the only reported NEPA case brought to our attention involving segmentation of a sewer expansion. As in the case before us, *Homeowners* involved the division of a single metropolitan sewer expansion program. Public hearings were held after the plan was announced, following which the Environmental Protection Agency determined that a limited EIS dealing with sewer lines only in one area would be prepared and no EIS would be prepared as to the remainder of the project. The federal district court held that the severance was "clearly within the discretion of the agency absent any arbitrary basis for its decision," citing *Kleppe v. Sierra Club*, 427 U.S. 390 (1976). 468 F. Supp. 405, 408.

We conclude that the standard of review employed by the Federal District Court in *Homeowners* is incompatible with that created by *WED III* which held:

> The arbitrary and capricious standard of review . . . gives too much room for the exercise of discretion by the agency. . . . [Section 1.11 (2) (c)] contemplates the exercise of judgment by the agency, but that judgment must be *reasonably exercised within the limits imposed by the Act.* 79 Wis.2d 409, 423–24, 256 N.W.2d 149, 157 (emphasis added).

Establishing the scope of the threshold decision is a discretionary decision. *WED III* requires that we approach the review of that discretion with a more limited standard, that of reasonableness.

Courts have grappled with the problem of segmentation since the inception of NEPA. "Specifying the proper scope of an EIS has emerged as one of the most diffi-

cult questions for the courts under NEPA." Professor William H. Rodgers, Jr., *Handbook on Environmental Law* sec. 7.9 at 791 (1977). The issue is implicit in the review imposed by *WED III*: whether the agency has developed a record "covering the relevant areas of environmental concern" and whether the agency has exercised reasonable judgment based on that record. 79 Wis. 2d 409, 424–25, 256 N.W.2d 149, 158.

WEPA and NEPA are silent as to segmentation. Determining the propriety of segmentation has been left to the courts. "In fact, this vaguely worded statute seems designed to serve as no more than a catalyst for the development of a 'common law' of NEPA. To date, the courts have responded in just that manner and have created such a 'common law.'" *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), separate opinion of Justice Marshall at 421. As WEPA was patterned after NEPA, *WED III*, 79 Wis.2d 409, 414, 256 N.W.2d 149, 153, and as no Wisconsin cases are in point, we look to federal decisions consistent with *WED III* for assistance.

Segmentation is not an *ipso facto* violation of the Act. "The rule against segmentation for EIS purposes is not an imperative to be applied in every case." *Sierra Club v. Callaway*, 499 F.2d 982, 987 (5th Cir. 1974). "Impermissible segmentation, simply put, is the defining of a project too narrowly for purposes of environmental analyses." Rodgers, *supra* at 787.

Professor Rodgers in reviewing federal decisions states,

In deciding whether a group of segments should be treated as a single project, courts look at "a multitude of factors, including the manner in which [the segments] were planned, their geographic locations, and the utility of each in the absence of the other." The cases ask whether the excluded segment has "independent significance," whether there is a strong "nexus" between the

two requiring concurrent EIS evaluation, whether one part is a "mere component" or "increment" of the other, whether the scope of the project addressed permits the evaluation of alternatives the Act requires. Rodgers, *supra* sec 7.9 at 788–89 (footnotes omitted).

Other factors used include whether "the segment under consideration seems to fulfill important state and local needs," *Daly v. Volpe,* 514 F.2d 1106, 1110 (9th Cir. 1975) ; whether it is an extension or a connective link, *Hawthorn Environmental Preserv. Ass'n v. Coleman,* 417 F. Supp. 1091, 1100 (N.D. Ga. 1976), *affd. per curiam* 551 F.2d 1055 (5th Cir. 1977) ; whether the segment serves "primarily local needs," *Id.;* whether the segment "is a unit unto itself, and can stand on its own two feet, or, on the contrary, whether it is so intertwined" with other units "that it is but an increment of the larger plan," *Sierra Club v. Stamm,* 507 F.2d 788, 791 (10th Cir. 1974) ; and whether "[a]s a practical matter, commitment of resources in one section tends to make further construction more likely," *Patterson v. Exon,* 415 F. Supp. 1276, 1282 (D. Neb. 1976).

Consideration of single factors is helpful, but no one factor can be determinative. Individual factors "are not talismans that truncate the natural scope of an EIS." *Appalachian Mountain Club v. Brinegar,* 394 F. Supp. 105, 117 (D.N.H. 1975). Each controversy must be decided on its own merits. *Hawthorn, supra.* "No general statement of a standard of review can provide a precise guideline of universal applicability. It is obvious that the inquiry needed to support an agency decision not to file an EIS will vary greatly with the circumstances." *WED III,* 79 Wis.2d 409, 424, 256 N.W.2d 149, 157.

We conclude that the DNR's decision to limit the scope of its threshold decision to consideration of the impact of

the segment terminating at Hales Corners was reasonable and should not be overturned.

The project ending at Hales Corners has independent utility. Regardless if the remaining segment is constructed, the interceptor will serve the useful and vital purpose of allowing abandonment of the inadequate Hales Corners treatment plant. The DNR worksheet indicates that the plant is currently discharging an effluent substantially in excess of the limitations with which it must comply by July 1, 1982.[6] The village must either upgrade or abandon its existing system in order to meet those limitations. The Hales Corners plant has been designated for abandonment since 1954. The worksheet explains:

The purpose of the proposed sewer is to contribute to the MSD's goal of eliminating wastewater effluent and bypassed raw sewage from the surface waters of its service area (specifically the Root River). The proposed sewer will provide for the elimination of 4 lift stations (two of which are equipped with permanent overflows), serve as a relief sewer system for a sanitary sewer collection system which is subject to bypassing, permit the abandonment of an existing inadequate wastewater treatment facility, and eliminate the discharge of inadequately treated effluent to surface waters. The insufficient capacity in the existing sanitary sewer collection and conveyance system and the inability of the Village of Hales Corners wastewater treatment facility to provide consistently adequate treatment has significantly contributed

[6] The project is also affected by the judgment in *Sewerage Comm. v. DNR*, Dane County Circuit Court case no. 152–342, which required improved treatment facilities at the Jones Island and South Shore treatment plants by July 1, 1982. Those plants will receive flows to be diverted from the Hales Corners' plant. We were advised during oral argument that the project is also affected by the judgment in federal district court in Illinois in *Illinois v. City of Milwaukee*, 72–C–1253 (N.D., Ill. Nov. 15, 1977), requiring defendant to cease discharging raw effluent into Lake Michigan. April 26, 1979 the Circuit Court of Appeals for the Seventh Circuit reversed that judgment in part and remanded it for modification in an as yet unpublished opinion.

to the pollution of the unnamed receiving stream which is tributary to the north branch of the Root River.

The segment terminating at Hales Corners not only fulfills a local need at Hales Corners but that is its primary purpose. According to the worksheet, eliminating the Hales Corners treatment plant is the "main purpose" of the interceptor at this time.

The logical termini test looks at the ends of a continuous project such as a highway or, in this case, a sewer interceptor. Thus, if a highway project begins and ends in "the middle of the woods," as opposed to connecting cities or highway interchanges, the project lacks logical termini. *See e.g., Patterson,* 415 F. Supp. 1276, 1283. As the trial court found, the interceptor discussed in the worksheet has logical starting and ending points. It begins where District sewer service in Milwaukee County now ends and terminates in Hales Corners, a community which must have new service.

Construction of the segment terminating at Hales Corners of course makes possible a second segment to serve New Berlin. Installation of the first segment does not, however, compel construction of the second. The DNR's approval of a sewer extension is required by sec. 144.04, Stats., and the DNR states in its worksheet that it treats extension proposals on a case-by-case basis. There is no evidence that the cost of the first segment makes its construction uneconomical unless New Berlin is also served. The worksheet notes that the diameter of the first segment allows for possible connection with the New Berlin system. Construction of a sewer sufficient only to satisfy the needs of today would, however, be "little short of folly" in view of the cost of future enlargement or building a parallel system. *Thielen v. Metropolitan Sewerage Commission,* 178 Wis. 34, 48, 189 N.W. 484, 490 (1922). There is no evidence in the worksheet that New Berlin must connect with the District's

system after the first segment is completed. That is a decision which is left to the future, despite installation of the first segment.

Indeed, the DNR specifically concluded in its worksheet that the extension of the sewer to the county line and the eventual elimination of the Regal Manors treatment facility, are reversible decisions at this point. The DNR found, "Since the proposed sewer is only extending to the Hales Corners treatment plant, virtually all decisions are reversible even after the proposed sewer is constructed."

It is conceded that if the second segment is installed so as to serve New Berlin, urban development in the New Berlin area may result. That development, however, is a secondary impact of that segment and not of the segment terminating at Hales Corners. The sewage and developmental problems of Hales Corners are separate and distinct from those of New Berlin. According to the DNR, Hales Corners is already ninety percent developed. The remaining ten percent will undoubtedly be developed, according to the worksheet, regardless of action taken on the interceptor terminating at Hales Corners. Hales Corners needs the interceptor because it must abandon its existing sewage treatment plant by 1982. Whether New Berlin needs service from the District or should be permitted to expand its surburban areas are questions which are irrelevant to the needs of Hales Corners.

The Decade argues that cumulative impacts of the two segments will be ignored if the projects are not considered together at this point in time. The WEPA guidelines explain that:

Many state agencies' actions regarding a project or complex of projects can be individually limited but cumulatively considerable. When an action forms a precedent for future individual actions or represents a decision in principle about a major course of action, the cumulative effects of future actions should be considered when de-

termining if an impact statement is required. *Guidelines, supra* I(5)(E) at 4.

More specifically, the Decade alludes to the possibility that the Milwaukee sewage treatment plants to which the sewage is to be diverted and which are already under two court orders to clean up operations (see footnote 6), may be overloaded by the combined flow from Hales Corners and New Berlin.

The worksheet shows consideration of cumulative impacts. The worksheet discusses possible cumulative impacts of the two segments and the impacts of other extensions in the area, including further land development. The worksheet states that additional extensions could overload the District's South Shore sewage treatment facility but that the District has identified future planned sewer extensions and that modifications to the South Shore facility "will provide the capacity to treat these additional wastes."

Our initial skepticism caused by the possibility that the DNR rigged the threshold decision is weakened not only by the DNR's worksheet analysis but also by the concurrence of the United States Environmental Protection Agency in that decision. Attached to the worksheet is a negative declaration by the EPA dated October 21, 1977. The EPA states in a summary which accompanies the declaration[7] that the interceptor terminating at Hales Corners will not be addressed in an EIS by that agency because the immediate service area within Milwaukee County is developed, negating potential secondary impacts associated with the project, and because the project eliminates a treatment facility that is frequently overloaded. The EPA states that the second segment will be included in an EIS, "based on the fact

---

[7] The negative declaration and summary are separated in the worksheet by another item but the brief of the DNR indicates that they should be read together.

that the primary function of this section will be to provide an outlet for anticipated flows from the proposed 'future' service area outside Milwaukee County."

It may be that the EPA joined the DNR in an effort to avoid compliance with NEPA, the sister Act of WEPA. The fact is, however, that the rationale stated by the EPA for not including the segment terminated at Hales Corners in an EIS is reasonable.

### E. *Conclusion*

The record developed by the DNR in its screening worksheet contains ample facts for judicial review of the decision to limit the scope of investigation to the environmental impact of the segment terminating at Hales Corners. Stated another way, the DNR developed a reviewable record covering the relevant areas of environmental concern when making its threshold decision, as required by *WED III*, 79 Wis.2d 409, 424–25, 256 N.W. 2d 149, 158. The decision to limit the scope of the threshold decision was a reasonable exercise of judgment.

The Decade concedes that the threshold decision, if reviewed solely within the scope of the application before the DNR, did not require a finding that the proposed action is a major action significantly affecting the quality of the human environment.

The order of the DNR approving the District's application was therefore properly affirmed by the trial court.

*By the Court.*—Judgment affirmed.

BABLITCH, J. *(Dissenting.)* With all respect for the thoughtful and candid opinion of the majority, I cannot concur in the result it reaches. In my view the effect of the opinion is to sanction a rather transparent subterfuge designed to evade the dictates of WEPA, as well as of a circuit court order compelling compliance with those dictates.

The record is replete with indications that the original proposal extending the Hales Corners interceptor an additional 2,000 feet in order to service the relatively undeveloped New Berlin area has never been abandoned by the District and is presently extant.[1] The majority concedes that the extension is "likely," that it "may be reasonably forecast" at this time, and that is "sufficiently definite" so that its impact on the environment could presently be determined. This being so, it is difficult to understand the majority's conclusion that the decision to complete the project as originally proposed has been "left to the future." The record shows that the decision has been made. It is merely the implementation of that decision, and compliance with WEPA, which has been left to the future.

The purpose of WEPA is to ensure that state agency decisions about actions which have a significant impact on the environment will be subject to public scrutiny and debate "to the fullest extent possible." Sec. 1.11, Stats. That purpose is not served by allowing an agency to isolate the environmentally insignificant portion of an intended project—here, seven-ninths of the whole—and pretend that the environmentally significant balance of the project does not exist. Allowing it to do so in this case has the effect of loading the scales of future debate over the New Berlin hookup with the *fait accompli* of a

---

[1] It is interesting to note that the application for the shortened version of the project was first filed in October, 1977, during the pendency of the Decade's circuit court action challenging the original application. It is apparent that the application was filed in anticipation of the trial court's remand of the original application to the DNR for compliance with WEPA, since a holding in favor of the DNR would have rendered the shortened application moot. In light of this background, as well as other facts cited in the majority opinion which show that the New Berlin hookup is still intended, I cannot agree with the majority's statement that both the District and the DNR have treated the shortened application as having superceded the original application.

Hales Corners system ready, able, and in fact designed to accommodate it. Therefore, although the extension decision is obviously "reversible" until it is actually implemented, the chances that it will be reversed are less once the first seven-ninths of the original project has been completed. This prejudices the full and impartial consideration of alternatives to the last two-ninths of the original proposal and makes the secondary effects of the hookup more likely. For these reasons alone, I would hold that the "proposal" presently before the agency is the project described in the original application, as to which an EIS and a public hearing are required by the act.

In addition, I disagree with the implicit holding of the majority that the question whether the DNR, the EPA and the District conspired to avoid WEPA and NEPA by segmenting the original project is immaterial to our review so long as the truncated segment can "stand on its own two feet." In *WED III*, the supreme court observed that "[w]hen a negative EIS determination is challenged, the question is whether the agency . . . has complied with the letter and spirit of WEPA." 79 Wis.2d 409, 419, 256 N.W.2d 149, 155 (1977). It seems to me that a deliberate scheme to circumvent the act by redefining a proposal to include less than is actually and presently intended violates both the letter and spirit of the act, and ought not to be condoned by reviewing courts. *See Thompson v. Fugate,* 347 F. Supp. 120 (1972), *Scientists' Institute for Public Information v. AEC,* 481 F.2d 1079 (1973).