WISCONSIN'S ENVIRONMENTAL DECADE, INC.; Door County Environmental Council, Inc.; The Gibraltar Township Property Owners Association, Inc.; and Lake Michigan Federation, Inc., Petitioners-Respondents,†

v.

DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, State of Wisconsin, Appellant.

Supreme Court

*No. 81-954. Argued October 5, 1981.—Decided December 1, 1981.*

(Also reported in 312 N.W.2d 749.)

---

† Motion for reconsideration denied, without costs, on January 11, 1982. ABRAHAMSON, J., took no part.

For the appellant there were briefs by *Arvid A. Sather* and *Michael, Best & Friedrich* of Madison, and oral argument by *Mr. Sather*.

For the respondents there was a joint brief by *Kathleen M. Falk*, of Madison, for Wisconsin's Environmental Decade, Inc., and *Brady C. Williamson* and *La Follette, Sinykin, Anderson & Munson* of Madison, for other respondents, with oral argument by *Ms. Falk* and *Mr. Williamson*.

Amicus Curiae brief was filed by *Eric Englund* of Madison, for Wisconsin Society of Architects and others.

A joint amicus curiae brief was filed by *Donald R. Zuidmulder* and *Cohen, Grant, Zuidmulder, Naze & Gazely, Ltd.*, of Green Bay, for League of Women Voters of Appleton, and others, and by *Peter A. Peshek* and *Thomas J. Dawson* of Madison, for Wisconsin Public Intervenor.

Amicus Curiae brief was filed by *David Leo Uelmen, Frederick Perillo* and *Goldberg, Previant, Uelman, Gratz, Miller, Levy & Brueggeman*, S.C., of Milwaukee, for Milwaukee Building and Construction Trades Council.

DAY, J.   This is a review of an order of the circuit court for Dane county, P. CHARLES JONES, presiding.

The issue in this case is whether the Wisconsin Environmental Policy Act (WEPA), sec. 1.11, Stats. 1979, requires the Department of Industry, Labor and Human Relations (DILHR), to take environmental factors into account when reviewing the plans of a building project for code compliance. We conclude that, while WEPA requires DILHR to consider environmental factors when promulgating building codes, WEPA does not apply to individual code approval decisions.

In 1978, the James Building Corporation (James) announced plans to build one hundred condominium units in Fish Creek, an unincorporated village in Door Coun-

ty, Wisconsin. The plans provided for a sewage treatment facility which would empty into Green Bay. This system required a number of permits from the Department of Natural Resources, (DNR). DNR prepared an environmental assessment screening worksheet (EASW) on the project and concluded that an environmental impact statement (EIS) was not necessary.

Persons opposed to the project, including some of the respondents in this action, commenced a lawsuit in the Door county circuit court, seeking to have the DNR decision reversed. The Door county circuit court issued a stay ordering DNR to halt all proceedings on the project until it reached a decision on the merits. That stay remains in effect.

On September 8, 1980, James submitted plans to DILHR providing for a 186,750-gallon holding tank as an alternative method of sewage disposal. A holding tank does not treat sewage, but stores it temporarily. Holding tanks must comply with chs. H 62–63, Wis. Adm. Code, but do not require DNR approval.

DILHR initially approved the plans, but, after receiving objections from interested parties including respondents, rescinded its approval since the holding tank was in a flood plain but did not meet the code requirements for holding tanks in flood plains. James submitted new plans, providing for a 250,000-gallon holding tank to be placed outside of the flood plain, on October 21, 1980. Respondents petitioned DILHR for a declaratory ruling that WEPA applied to the code compliance decision and asked for a contested case hearing. DILHR denied these requests on November 11, 1980, and approved James' plans on November 17, 1980.

On December 10, 1980, respondents filed a petition in Dane county circuit court for review of DILHR's approval of the plans, and on January 6, 1981, filed a motion for a stay of DILHR's approval of the plans. On January 16, 1981, Dane county circuit court Judge P. Charles Jones granted the stay, halting construction. The cir-

cuit court issued its memorandum decision and order on April 20, 1981, holding that WEPA did apply to DILHR's code compliance review and remanding the case to DILHR for WEPA compliance. DILHR petitioned this court to bypass the court of appeals, sec. 808.05(1), Stats. 1979-80. The petition was granted by this court.

DILHR's decision not to conduct an environmental inquiry when reviewing the project's holding tank plans for code compliance was a result of its policy of applying WEPA to its rulemaking process but not to its code compliance review decisions. Interpretation of a statute by an administrative agency is a conclusion of law which may be independently reviewed by the supreme court. *Bucyrus-Erie Co. v. ILHR Dept.*, 90 Wis. 2d 408, 417, 280 N.W.2d 142 (1979). However, the construction and interpretation of a statute by the administrative agency which must apply the law is entitled to great weight and if several rules or applications of rules are equally consistent with the purpose of the statute, the court should defer to the agency's interpretation. *Milwaukee County v. ILHR Dept.*, 80 Wis. 2d 445, 455-456, 259 N.W.2d 118 (1977). In general, the reviewing court should not upset an administrative agency's interpretation of a statute if there exists a rational basis for that conclusion. *Dairy Equipment Co. v. ILHR Dept.*, 95 Wis. 2d 319, 327, 290 N.W.2d 330 (1980).

The test as to whether an environmental impact study should be conducted is essentially one of reasonableness and good faith, *Wisconsin's Environmental Decade v. Public Service Commission*, 79 Wis. 2d 409, 421-423, 256 N.W.2d 149 (1977). Accordingly, the method by which an administrative agency chooses to comply with WEPA's mandate that it take environmental factors into account when undertaking its statutory duties should be affirmed if that method is a reasonable one in light of

the purposes of WEPA and the agency's functions and duties.

WEPA requires that state agencies review the environmental consequences of decisions which may significantly affect the quality of the human environment.[1]

---

[1] "1.11. **Governmental consideration of environmental impact.** The legislature authorizes and directs that, to the fullest extent possible:

"(1) The policies and regulations shall be interpreted and administered in accordance with the policies set forth in this section and chapter 274, laws of 1971, section 1; and

"(2) Except as provided in s. 145.022, all agencies of the state shall:

"(c) Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment, a detailed statement, substantially following the guidelines issued by the United States council on environmental quality under P.L. 91–190, 42 U.S.C. 4331, by the responsible official on:

"1. The environmental impact of the proposed action;

"2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;

"3. Alternatives to the proposed action;

"4. The relationship between local short-term use of man's environment and the maintenance and enhancement of long-term productivity; and

"5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

"6. Such statement shall also contain details of the benefit aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal.

"(d) Prior to making any detailed statement, the responsible official shall consult with and obtain the comments of any agency which has jurisdiction or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate agencies, which are authorized to develop and enforce environmental standards shall be made available to the governor, the department of natural resources and to the public. Every proposal other than for legislation shall receive a public hearing before a final decision is made. Holding a public hearing as required by another statute fulfills this section. If no public hearing is otherwise required, the respon-

In 1976, an executive order, entitled *Revised Order, Guidelines For The Implementation Of The Wisconsin Environmental Policy Act,* Executive Order No. 26 (February 12, 1976), instructed all state agencies to categorize the decisions which they make according to the likelihood that they will require a review of their environmental consequences.

To fulfill WEPA's mandate, DILHR decided to apply WEPA review, including an EASW and, if necessary, an

sible agency shall hold the hearing in the area affected. Notice of the hearing shall be given by publishing a class 1 notice, under ch. 985, at least 15 days prior to the hearing in a newspaper covering the affected area. If the proposal has state-wide significance, notice shall be published in the official state newspaper;

"(e) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

"(h) Initiate and utilize ecological information in the planning and development of resource-oriented projects.

"(3) All state agencies shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this section and chapter 274, laws of 1971, section 1 and shall propose to the governor not later than July 1, 1972, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this section and chapter 274, laws of 1971, section 1.

"(4) Nothing in this section affects the specific statutory obligations of any agency;

"(a) To comply with criteria or standards of environmental quality;

"(b) To coordinate or consult with any other state or federal agency; or

"(c) To act, or refrain from acting contingent upon the recommendations or certification of any other state or federal agency.

"(5) The policies and goals set forth in this section are supplementary to those set forth in existing authorization of agencies."

EIS, to the code promulgation process but not to code compliance review.[2]

DILHR is responsible for the adoption and enforcement of building, heating, electrical, ventilation, air conditioning and plumbing codes.[3] Pursuant to secs. 145.01

---

[2] DILHR reviews approximately 12,000-building permits per year. When the legislature passed WEPA, it provided no additional appropriations to state agencies to fulfill their WEPA functions. Subsequent attempts by agencies to get funding for WEPA duties have also proved unsuccessful. See J. Hanson, *Agency Decisionmaking Under The Wisconsin Environmental Policy Act,* 1977 Wis. L. Rev. 111, 126–128, 159–161.

DILHR asserted, and respondents did not dispute, that WEPA was applied to its promulgation of building codes. EASWs concerning the plumbing codes which apply to holding tanks were prepared by DILHR on June 9, 1980, concerning ch. H 63, Wis. Adm. Code (1980) and by DH&SS on September 19, 1975, concerning sec. H 62.20, Wis. Adm. Code (1975).

[3] "101.02. **Powers, duties and jurisdiction of department.** It shall be the duty of the department, and it shall have power, jurisdiction and authority:

"(1) To adopt reasonable and proper rules and regulations relative to the exercise of its powers and authorities and proper rules to govern its proceedings and to regulate the mode and manner of all investigations and hearings. . . .

"(15) (a) The department has such supervision of every employment, place of employment and public building in this state as is necessary adequately to enforce and administer all laws and all lawful orders requiring such employment, place of employment or public building to be safe, and requiring the protection of the life, health, safety and welfare of every employe in such employment or place of employment and every frequenter of such place of employment and the safety of the public or tenants in any such public building. . . .

"(j) To ascertain, fix and order such reasonable standards, rules or regulations for the construction, repair and maintenance of places of employment and public buildings, as shall render them safe."

"101.12 **Approval and inspection of public buildings and places of employment and components.** (1) The department shall require the submission of essential drawings, calculations and specifications for public buildings, public structures and places of employment. . .

(5) and 145.02, Stats. 1979–80, DILHR is responsible for general supervision of plumbing construction, installation and maintenance.[4] Sec. 145.02(3)(d) authorizes

"(2) Plans of said buildings, structures and components shall be examined for compliance with the rules of the department and a statement of the examination returned to the designer and owner before construction is started. Nothing in this section shall relieve the designer of the responsibility for designing a safe building, structure or component."

"145.13 Promulgation of plumbers' code. The state plumbing code and amendments thereto as adopted by the department have the effect of law in the form of standards state-wide in application and shall apply to all types of buildings, private or public, rural or urban, including buildings owned by the state or any political subdivision thereof. All plumbing installations shall so far as practicable be made to conform with such code."

The building, heating, ventilation and air-conditioning codes are in Chs. Ind. E. 50–64, Wis. Admin. Code. The electrical code is in Chs. sec. 1–145, Wis. Admin. Code and the plumbing code is contained in Chs. H 62–63, Wis. Admin. Code.

[4] "145.01. Definitions. . . . (5) DEPARTMENT. 'Department' means the department of industry, labor and human relations."

"145.02. Powers of department. (1) The construction, installation and maintenance of plumbing in connection with all buildings in this state, including buildings owned by the state or any political subdivision thereof, shall be safe, sanitary and such as to safeguard the public health.

"(2) The department shall have general supervision of all such plumbing and shall after public hearing prescribe and publish and enforce reasonable standards therefor which shall be uniform and of state-wide concern so far as practicable. Any employe designated by the department may act for the department in holding such public hearing.

"(3) The department may exercise such powers as are reasonably necessary to carry out the provisions of this chapter. It may, among other things: . . .

"(d) Prepare and cause to be printed such codes, bulletins or other documents as may be necessary and furnish copies thereof to those engaged in the plumbing business and to the public upon request. . . .

"(f) Issue special orders directing and requiring compliance with the rules and standards of the department promulgated under this chapter whenever, in the judgment of the department, the rules or standards are threatened with violation, are being vio-

DILHR to promulgate plumbing codes. When the codes are adopted or revised, DILHR applies the WEPA mandated environmental review process as a part of the rulemaking procedure which it undertakes pursuant to ch. 227, Stats.

Secs. 227.011–227.029, Stats., provide a comprehensive framework for administrative rulemaking. Persons may petition an agency to adopt, repeal or revise a rule.[5] Fiscal estimates are prepared,[6] and the rule is submitted to the legislative council for form, need and validity.[7] Hearings are held,[8] for which proper notice must be given[9] the conduct of which is governed by statute.[10] The proposed rules are then submitted to the legislature[11] and published[12] before they go into effect.

The administrative rulemaking procedures seem to parallel the consultation, notice and hearing provision of WEPA.[13] Persons or organizations with opinions as to the environmental effect of a rule can make their views known to the rulemaking body, and the ch. 227 procedure

lated or have been violated. The circuit court for any county where violation of such an order occurs has jurisdiction to enforce the order by injunctive and other appropriate relief. The attorney general or the district attorney of the county where the violation of the order occurs shall bring action for its enforcement. The department may issue an order under this paragraph to abate a violation of s. 146.13 or 146.14.

"(g) By rule, fix fees for the examination and approval of plans of plumbing systems and collect the same."

Prior to April 29, 1980, the effective date of ch. 221, Laws of 1979, functions relating to the plumbing code rested with the Department of Health and Social Services, (DH&SS), see ch. 221, section 643, Laws of 1979.

[5] Section 227.015, Stats. 1979–80.

[6] Section 227.019, Stats. 1979–80.

[7] Section 227.029, Stats. 1979–80.

[8] Section 227.02, Stats. 1979–80.

[9] Section 227.021, Stats. 1979–80.

[10] Section 227.022, Stats. 1979–80.

[11] Section 227.018, Stats. 1979–80.

[12] Section 227.025, Stats. 1979–80.

[13] See section 1.11 (2) (d), Stats. 1979–80.

provides a framework for a comprehensive consideration of environmental factors.

Assuming, without deciding, that DILHR has authority to apply WEPA considerations to code compliance reviews,[14] the question is: Has DILHR complied with WEPA in applying its provisions only to its code promulgation functions. DILHR has in effect focused its environmental review on the program or policy level rather than the specific project level. This mode of analysis provides for review, on a broad scale, of agency decisions which individually might be overlooked as environmentally insignificant.[15] It also assures that environmental considerations are taken into account before significant resources are expended on a project.

■

We conclude WEPA does not compel DILHR, which has complied with WEPA in the rulemaking process, to also apply WEPA review to code compliance decisions. Building codes are contained in Chs. INd. 50–64 and H 62–63, Wis. Adm. Code. They contain detailed and comprehensive specifications which must be adhered to before a permit may be issued. Sec. INd. 50.14 provides for an interim permit to start construction, which may be issued by the department upon submission, but prior to approval, of the plans. While someone who starts construction based upon the interim permit runs the risk that the department may not approve the plans, this risk is minimized by the specificity of the codes, which enable the builder who has diligently incorporated the code provisions into his plans to start work, confident that the plans will be approved.

[14] Such authority would seem to be inconsistent with the legislative authorization for DILHR to delegate code compliance review function to local units of government, which are not subject to WEPA. *See* discussion of this matter, *infra*, in this opinion.

[15] See J. Hanson, *Agency Decisions Under WEPA*, 1977 Wis. L. Rev. 111, 166–179, which advocates an increased use of program-wide rather than specific project WEPA review.

DILHR has estimated that it makes around 12,000-code compliance decisions a year. Respondents did not take issue with this assessment. Review on such a scale is possible because of the detail of the codes. The straight forward and nondiscretionary process by which plans are reviewed for code compliance was commented on by this court in *Dunn v. State,* 125 Wis. 181, 190–191, 102 N.W. 935 (1905):

"It is clear from the uncontradicted facts in evidence that the application by the Pabst Brewing Company for a permit to erect this bottling house involved no exercise of any discretion by the accused as building inspector. He informed Mr. Pabst, and insisted upon the trial, that he could not grant the permit applied for, because the plans and specifications obviously violated the building regulations of the city, in that the floor areas within the specified walls were largely in excess of what was permitted and allowed by such regulations; nor does the plaintiff in error dispute or claim but that such was the fact, and that no permit could properly be granted to build the structure pursuant to the plans and specifications submitted. Under these facts and circumstances it is apparent that no question of discretion arose in passing upon the application for a permit to erect this building, . . ."

Other jurisdictions have held that a person who is refused a building or plumbing permit is entitled to a writ of mandamus compelling the issuance of the permit if he shows that the project complied with applicable codes.[16] This reflects the role of codes as detailed norms which a builder must incorporate into a project rather than as nebulous indicators of social policy to guide a

---

[16] *Munns v. Stenman,* 152 Cal. App. 2d 543, 314 P.2d 67, 76 (1957); *Timko v. Chotkowski,* 26 Conn. Supp. 266, 220 A.2d 286, 289 (1966); *State Dept. of Health v. Walker,* 238 Md. 512, 209 A.2d 555, 561 (1965); *Fellsway Realty Corp. v. Building Comr. of Medford,* 332 Mass. 471, 125 N.E.2d 791 (1955); *Berry v. Embrey,* 238 Miss. 819, 120 So. 2d 165, 168 (1960); *Vagnoni v. Brady,* 420 Pa. 411, 218 A.2d 235, 237 (1976). *See generally,* 101A C.J.S., *Zoning and Land Planning,* Section 295b (1979); 9 McQuillin, *Law of Municipal Corporations* (3rd ed.), Sections 26.206, 26.221 (1978).

quasi-adjudicative decision maker in determining the worth of a building project.

Incorporation of social policy values by DILHR, such as those reflected in WEPA, is here done by code promulgation rather than code compliance review. This policy is reflected by Sections INd. 50.21–22, Wis. Adm. Code (1980),[17] wherein DILHR has delegated code compliance review to certain municipalities. WEPA by its terms applies only to decisions by state agencies. Local deci-

[17] "INd. 50.21 **First class city examination and approval.** Drawings, specifications and calculations for all buildings and structures, except state-owned buildings and structures, to be constructed within the city limits of Milwaukee shall be submitted to the inspector of buildings, Milwaukee, for examination and approval."

"INd. 50.22 **Certified cities examination and approval.** Drawings, specifications and calculations for all new buildings and structures containing less than 50,000 cubic feet total volume and alterations to buildings containing less than 100,000 cubic feet total volume, except state-owned buildings and structures, shall be submitted to cities certified by the department for examination and approval according to requirements of this code. Drawings, specifications and calculations submitted to said cities for examination and approval need not be submitted to the department. The buildings must be located within the city limits of the certified city."

DILHR's authority to delegate this function is provided for by Sec. 101.12(3)(a) and (b), Stats. 1979, which reads:

"101.12. **Approval and inspection of public buildings and places of employment and components.** . . . . (3) The department shall:

"(a) Accept the examination of essential drawings, calculations and specifications in accordance with sub. (1) performed by cities of the 1st class provided the same are examined in a manner approved by the department.

"(b) Accept the examination of essential drawings, calculations and specifications in accordance with sub. (1) for buildings containing less than 50,000 cubic feet of volume and alterations to buildings containing less than 100,000 cubic feet of volume performed by cities of the 2nd and 3rd class provided the same are examined in a manner approved by the department. The department shall determine and certify the competency of all such examiners."

Section H 65.25(2)(d), Wis. Admin. Code (1979), provides for a similar delegation of plumbing code compliance review.

sions are outside of its scope. If WEPA were interpreted to apply to the code compliance review process, applicants for building permits in the municipalities to whom DILHR delegated code review, would not be subjected to its provisions.[18] This would defeat the statewide uniformity goal underlying the state building code,[19] and envisioned in the Environmental Policy Act. In contrast to code compliance review, all code promulgation is done at the statewide level and consideration of WEPA at this level would not undermine uniformity.

DILHR's application of WEPA to code promulgation and not to code compliance review is consistent with prior interpretations of WEPA. In *Wisconsin's Environmental Decade, supra,* we held that WEPA did not require one specific mode of compliance and that program wide, or generic, impact statements were not merely acceptable, but may be preferable in certain situations.

"[W]e are not insensitive to the possibility that the environmental issues may in fact be complex and that a comprehensive consideration of these issues might consume considerable time. We have indicated that the

[18] The plumbing code, Sec. H 63.18(2), Wis. Adm. Code (1980), permits local units of government to prohibit construction of any holding tanks within their boundaries.

"H 63.18 **Holding tanks.** . . . (2) PROHIBITING HOLDING TANKS. Holding tanks for new construction may be prohibited by county ordinance. If the county allows the use of holding tanks for new construction, then such use may be prohibited by city, village, or town ordinance. If a governmental unit prohibits holding tanks for new construction, then the governmental unit shall provide an appeal procedure to this prohibition. The county board, city council, village board or town board or the designated committee of such governmental unit, may grant variances to their holding tank prohibition. The county, city, village or town shall inform the department in writing of each variance."

[19] *See, Note: Building Codes: Reducing Diversity And Facilitating The Amending Process,* 5 Harv. J. Legis. 587 (1968) for discussion of the benefits of statewide, rather than local, building codes.

obligations imposed by sec. 1.11, Stats., are not inherently discretionary or flexible. However, we think an agency possesses a reasonable amount of discretion as to the precise mode by which compliance is effected. We think such discretion includes the Commission's developing a generic or 'programmatic' EIS for rate proceedings. Indeed, the case-by-case or project-by-project approach to the threshold question of whether an EIS is required may in certain areas be too limited." *Wisconsin's Environmental Decade, supra,* 79 Wis. 2d at 439.

Agency discretion in its mode of WEPA compliance was emphasized in *Holtz & Krause, Inc. v. DNR,* 85 Wis. 2d 198, 215, 270 N.W.2d 409 (1978), in which this court found no WEPA violation where DNR conducted an inquiry which was the "functional equivalent" of an EIS.

We hold that DILHR in applying WEPA to its code promulgation function and not to individual code compliance review conforms to the requirements of the Environmental Policy Act. We conclude that DILHR was not in violation of that act in approving the sewage holding tank at issue here.

*By the Court.*—Order reversed and cause remanded with directions to dismiss the complaint.

ABRAHAMSON, J., took no part.

HEFFERNAN, J. (*dissenting*). I respectfully disagree with the conclusion of the majority in reversing the judgment of the trial court. By so doing it vitiates the Environmental Protection Act (sec. 1.11, Stats.) in Wisconsin and approves the sorry record of the Department of Industry, Labor and Human Relations (DILHR) in refusing to conform with the legislative mandates, executive orders, and guidelines designed to protect the environment and to facilitate administration of the act. DILHR's position is so fatuous as to be ludicrous were it not for the fact that it appears to have convinced the majority that lawlessness is lawful.

The basic question is whether DILHR can refuse to make any assessment of the environmental effect of the construction of a large sewage-holding tank on the assertion, unsupported by the trial court's findings or the record, that relevant environmental factors were considered at the time the plumbing code was formulated and that, therefore, it has no duty in the individual case to determine whether a particular action or construction project has any effect upon the environment but has only the ministerial duty of assuring that there is compliance with the plumbing code. It baldly states its position in respect to the consideration of the plans of this construction, the largest sewage holding tank ever to be proposed in this state, by stating:

"DILHR's approval of plans and specifications is totally unrelated to whether the construction . . . is desirable . . . what impact it will have on the community and environment, and what alternatives are available. These are matters of local concern . . . . DILHR only performs the narrow function of reviewing the plans and specifications to assure that they are in compliance with the pertinent building codes."

The majority, by its opinion, sanctions DILHR's flouting of the law and approves DILHR's blatant refusal to even consider, at the time it issues permits, the impact of the proposed major construction on the environment. I would conclude that DILHR, and every other state agency, is required by Wisconsin Environmental Policy Act (WEPA) to give individual consideration to all major actions significantly affecting the human environment and is relieved of the duty of so doing in respect to other actions only if it has categorized or classified by prior consideration actions "which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement." 40 CFR 1500.4 (p). This categorization is man-

dated by sec. 1.11(2)(c), Stats., 40 CFR 1500, and as further set forth in Executive Order 26 of Governor Patrick J. Lucey dated February 12, 1976, and other executive orders.

Although the statement of facts appearing in the majority opinion is not incorrect, it fails to state with complete adequacy the nature of the holding-tank project and the circumstances under which it was proposed to be built. The record shows that in 1978 the James Building Corporation announced its intention to build condominium units in Door County. The units, variously stated in the record to be 100, 85, or 83, were to be built at Fish Creek, an unincorporated village in Door County, an area which, because of the geology of the Door peninsula, has had serious water-quality and sewage-disposal problems.

The original plans provided for a sewage treatment facility that would discharge effluent directly into Green Bay. Sewage treatment facilities are under the jurisdiction of the Department of Natural Resources (DNR), and that agency's approval is required. Following the submission of plans, there was intra-agency disagreement over whether an Environmental Impact Statement (EIS) should be prepared. Subsequently, DNR prepared an Environmental Assessment Screening Worksheet (EASW) and determined that an EIS was not required.

The petitioners in the present action, some of whom live in the Door County area, commenced an action in the Door County Circuit Court challenging DNR's decision. The Door County Circuit Court ordered the DNR to stay further action on the James Building Corporation's condominium project until a decision could be reached on the merits. The stay was ordered because the circuit court determined that there was a reasonable likelihood that the petitioners would be successful on the merits of their action, i.e., that there was a probability that the con-

struction of the sewage system was a major action "significantly affecting the quality of the human environment."

The DNR, faced with that preliminary conclusion, acquiesced in the findings and conclusions of the Door County Circuit Court, and it entered into a stipulation with the petitioners, withdrew its EASW on the basis of which it had initially concluded an environmental impact statement was not needed, and joined with the United States Environmental Protection Agency (EPA) in preparing an environmental impact statement for the entire middle third of Door County, including the site of the James Building Corporation's proposed condominium. The environmental impact statement was to be prepared for the purpose of analyzing the direct and secondary impacts of various alternatives in the major facilities plan being designed to solve waste-water problems in the entire area, and also to develop methods of reducing the environmental impact on the ground water used for the public drinking supply and the waters of Lake Michigan, Green Bay, and the local harbors.

In an attempt to avoid the delay in condominium construction which would ensue as a result of the circuit court's stay and the DNR's proposed EIS, the James Building Corporation submitted plans to DILHR for a 186,750-gallon holding tank. The plan finally approved contemplates a 250,000-gallon tank. This tank is enormous, the largest ever proposed in the State of Wisconsin. The dimensions of the tank are 45 feet by 70 feet and 14½ feet in height. It is proposed that it be erected within a few feet of the waters of Green Bay in an area where the water table is only two feet below the surface. The record shows that the holding tank is not designed as an installation to be permanently used for that purpose, but is rather intended, if DNR approval can be obtained, to be a portion of the sewage treatment facility to which the DNR has now declined to give its approval.

Holding tanks do not treat sewage but only store it temporarily. They must be periodically emptied and the contents transported to a disposal site. The DNR, in its initial EASW prepared to assess the condominium's sewage treatment facility, concluded that a holding tank was not an appropriate type of construction and not an acceptable alternative because the waste must be hauled off-site for disposal. The DNR's EASW pointed out that land disposal sites are limited in Door County due to the soil and bedrock conditions.

Under sec. 144.04, Stats., the DNR has jurisdiction to grant or deny permits for sewage treatment facilities. However, under sec. 145.20(3), jurisdiction over private sewage systems is given to DILHR. Sec. 145.01(14) defines a private sewage system as including "a holding tank," but it is not an alternative sewage system; hence, it is not within the exception of sec. 145.022(5). Although this grant of authority to DILHR appears to be inconsistent with the plenary authority conferred upon DNR by sec. 144.025, it is not argued in this proceeding that the power to approve or disapprove holding tanks is not within the jurisdiction of DILHR.

Because the provisions of sec. 145.01(14), Stats., by its terms, were not to become effective until July 1, 1980, DILHR adopted an emergency rule, which became effective on June 21, 1980, and expired on October 19, 1980. Initially, the James Building Corporation submitted its holding tank plans on September 8, 1980, and they were approved by DILHR on the same day. Shortly thereafter the petitioners, by letter, raised a number of objections to DILHR's approval of the plans. They stated that DILHR had failed to comply with its own emergency rule, and stated what has become the essence of this proceeding—that DILHR, in granting its approval, had failed to evaluate in any way the environmental consequences of the project. The petitioners pointed out that

the erection of the holding tank in a flood plain impinged upon the jurisdiction of the DNR.

DILHR acquiesced in the latter objection by the petitioners and rescinded its approval, because of the proposed location in the flood plain. It also advised the James Building Corporation that, unless the tank was moved out of the flood plain area, the approval of DNR would be required and that, because the DNR was under a stay order, the only alternative was to move the tank.

On October 21, 1980, the James Building Corporation submitted a new holding-tank plan showing the location to be out of the immediate flood plain area. While this new plan was pending, EPA requested DILHR to delay any action on the plan and stated that it was preparing an environmental impact statement involving the entire area. On November 6, 1980, DNR told DILHR that it was rescinding its decision that an EIS was not required, and both DNR and EPA asked DILHR to defer decision in the interests of keeping open all the options for the solution of the area's waste-water problems.

By October 19, 1980, DILHR's emergency rule had, by its own terms, expired. Nevertheless, DILHR on November 17, 1980, approved the new holding tank plan. DILHR acknowledges that the emergency rule was not in effect but asserts that its approval of the new plan was subject to the old rules of the Administrative Code, H 62.20(9). H 62.20(9) was a rule promulgated by the Department of Health and Social Services (DH&SS) in 1975. It provides that, "Holding tanks shall be considered on an individual basis."

While approval of the plan was pending, DILHR denied the petitioners' request for a declaratory ruling and denied a declaration that the case was "a contested one" under the Administrative Procedure Act. Following DILHR's approval of the new holding tank plan, the petitioners commenced this action in the Circuit Court for

Dane County asking a review of: (1) DILHR's denial of petitioner's request for a declaratory ruling, (2) DILHR's denial of a contested case hearing, and (3) DILHR's approval of the holding tank plan.

The Circuit Court for Dane County, in which this action was brought, found, as had the Circuit Court for Door County earlier in respect to DNR action, that there was a likelihood that the petitioners would succeed on the merits because DILHR had made no environmental assessment and had not even prepared an EASW on the holding tank permit. The court concluded that a disposition on the merits would probably result in a decision that the holding tank was a major project significantly affecting the quality of the human environment and would require an environmental impact statement. The court entered its final order on April 20, 1981, concluding that DILHR had failed to comply with the requirements of WEPA, and it remanded the proceedings to DILHR for compliance with the state law.

As the majority opinion indicates, we granted DILHR's motion to bypass the Court of Appeals.

The record, as we have received it, demonstrates that DILHR gave no consideration whatsoever to any environmental factors with respect to the approval of the plan for the holding tank. DILHR, however, does not conclude, or even argue, that its decision is not environmentally significant. Indeed, it could hardly so argue given the conclusions reached by EPA, the DNR, and the Circuit Courts for Door County and Dane County. Its argument is that all environmental imperatives were complied with at the time the rules applying to holding tanks were adopted in 1975 and in 1979 and 1980. Its argument simplistically stated is that, if the plans conform to the codes in respect to the details of the construction of holding tanks, that is all that is required, because the codes, by the methods used in their promulgation, incorporated all of the appropriate standards

necessary to protect the environment under WEPA, and hence DILHR's function was merely the ministerial one of laying the plans alongside the specifications of the code to determine their conformity.

The validity of DILHR's argument depends upon several underpinnings, none of which were given scrutiny in the majority opinion. DILHR's argument rests on the premise that the duties imposed by WEPA can be discharged at a building-code-formulation stage, even though the types of structures or actions that might result under the building codes may encompass a wide variety of situations, from the most trivial to those that would constitute major actions which could substantially affect the environment. It also rests on the assumption that the broad sweep implicit in the first proposition is as a matter of law correct and that environmental factors were indeed given adequate consideration when the particular code in question was formulated. There is a third and ancillary proposition to which the majority analysis addresses itself not at all, and that is whether there was any code in effect at the time of DILHR's approval decision. I address the last proposition first.

As set forth in the statement of facts, the responsibilities in ch. 145, Stats., for various plumbing codes were transferred from the DH&SS to DILHR in April 1980. However, certain revisions to ch. 145 by chs. 34 and 262, Laws of 1979, were to become effective on July 1, 1980. Because the new statutory responsibilities imposed upon DILHR were not yet effective, DILHR repealed, by acceptable rule-promulgation procedure, the existing DH&SS Rule H 62.20 and adopted H 63 as an emergency rule. This emergency rule had the effect and purpose of repealing the pre-existing DH&SS rule. The expiration of the emergency provisions of H 63, after one hundred twenty days as a matter of law, terminated the emergency rule. Sec. 227.03, Stats., provides that, "The repeal of a rule does not revive a rule which previously had

been repealed." Hence, there were no administrative rules or codes governing DILHR's plan approval of the holding tank following the expiration of the emergency rule on October 19, 1980, until January 1, 1981, when H 63 became effective as a properly promulgated and regularly adopted rule.

If that proposition is correct—and I believe it to be—DILHR was guided and controlled by no effective rule at the time it approved the holding tank plan. It was relying upon a rule which simply no longer continued to exist. I do not rest my dissent on that proposition, however, for even if we are to assume that old H 62.20 was in effect when DILHR approved the plan, there is no support for the proposition that DILHR's duty under WEPA may be discharged by the blanket consideration of plumbing codes, with no consideration to be given in respect to the magnitude of a particular project or to where or under what circumstances or under what geological conditions a holding tank might be installed. In addition, of course, there is nothing of record to show that environmental considerations were adequately taken into account when H 62.20 was promulgated or even when H 63 was finally adopted as a regular rule of DILHR.

Sec. 1.11 (2) (c), Stats., requires all agencies of the state, to the fullest extent possible, to:

"(c) Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment, a detailed statement, substantially following the guidelines issued by the United States council on environmental quality . . . ."

The detailed statement is required to include:

"1.  The environmental impact of the proposed action;
"2.  Any adverse environmental effects which cannot be avoided should the proposal be implemented;
"3.  Alternatives to the proposed action;

"4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

"5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

"6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal."

It is important to note also that the Wisconsin statute requires all state agencies to substantially follow the guidelines of the United States Council on Environmental Quality (CEQ). Accordingly, its guidelines, to the extent that they can be followed, have the effect of law and control the actions of all state agencies.

In interpreting sec. 1.11, Stats., this court has expressly held that an agency's decision not to prepare an environmental impact statement is reviewable by the courts. *Wisconsin's Environmental Decade, Inc., v. Public Service Comm.*, 79 Wis. 2d 409, 256 N.W.2d 149 (1977). The question for a court to decide is whether an agency's decision not to prepare an EIS was reasonable under the circumstances. *Wisconsin's Environmental Decade, supra* at 421. However, the first obligation which must be discharged by an agency seeking to avoid the preparation of an EIS is to develop:

". . . a reviewable record reflecting a preliminary factual investigation covering the relevant areas of an environmental concern in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences . . . ." *Wisconsin's Environmental Decade, supra* at 425.

We also in the same case pointed out that the agency must show justification for its negative EIS decision and that such a conclusion should be subject to the court's "searching inquiry" to see whether the agency took a

"hard look" at the problem as opposed to bald conclusions.

I recognize the difficulties of an agency whose original legislative purpose was not primarily environmentally oriented. It is clear in the instant case that DILHR sees as its principal function the facilitation of the construction of various building projects throughout the state—to make it possible for labor and industry to perform the functions which they serve in this society. It is correct for DILHR to have those concerns. The legislature, however, by sec. 1.11(5), Stats., pointed out that the policies and goals of the Wisconsin Environmental Policy Act were "supplementary to those set forth in existing authorization of agencies." Accordingly, the responsibilities under the Environmental Policy Act are in addition to those for which the agency was primarily formed and, by legislative fiat, have been made a matter of all-pervading importance.

The problem which DILHR faces—and it is a real one for that agency and for the innumerable segments of the public which rely upon its services—is to discharge its duties under the environmental statutes while at the same time processing thousands of applications, permits, and plans.

It is therefore appropriate and necessary to facilitate the administration of the act. One method to accomplish this is for agencies to categorize various types of actions as either needing or not needing environmental assessments. This methodology is set forth in the guidelines of the Federal Council on Environmental Quality which are mandated upon state agencies by sec. 1.11, Stats. The guidelines are also mandated upon state agencies by the executive orders of Governor Lucey. The CEQ guidelines are to be found in 40 CFR 1500. One of those guidelines directs that agencies may reduce the time involved in the preparation of environmental statements and shall reduce excess paperwork by:

"1500.4 (p) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement."

This imperative, which must be followed if environmental impact statements are not to be prepared on trivial projects, was further explained and implemented in Governor Lucey's Executive Order No. 69, dated December 5, 1973, and as revised in November 1975 and April 1977. These guidelines, which are explanatory of every agency's duties under sec. 1.11, Stats., require agencies to categorize the types of actions which are likely to come under their jurisdiction. The obligations imposed upon agencies by sec. 1.11(2) are also based on the interpretations of the statute given to it by the Interagency WEPA Coordinating Committee, which is composed of representatives of each state agency affected. These guidelines were for the purpose of facilitating administrative decisions under WEPA to reduce the cost and delays involved. These guidelines, which were issued as executive orders, require each state agency to classify the decisions it makes into the following three types of actions:

"(1) *Type I* actions clearly are major . . . and thus will always require environmental impact statements; (2) *Type II* actions may or may not be major or significantly affect the quality of the human environment depending on the facts of the particular case, and thus may not require environmental impact statement preparation; . . . . and (3) *Type III* actions are ones where the action could not be major . . . and thus will not require environmental impact statements." *Guidelines for the Implementation of the Wisconsin Environmental Policy Act (November 1975), Governor's Executive Order*, p. 5.

Thus, it is apparent that the National Council on Environmental Quality, as well as the WEPA Coordinat-

ing Committee, has recognized the problems that DILHR faces and has devised and mandated an appropriate method of dealing with them. These guidelines are effective by virtue of the act and are in effect, irrespective of the purported repeal of Governor Lucey's directives, because these guidelines are explanatory of CEQ guidelines, which are mandated by sec. 1.11, Stats. These guidelines, formulated by the WEPA Coordinating Committee, constitute the consensus for administrative interpretation of all of the Wisconsin agencies which are obliged to struggle with the problem of compliance with WEPA. It is uncontradicted that most agencies have specifically incorporated the guidelines into their agency rules. Two agencies directly concerned with environmental pollution, the DNR and the PSC, have incorporated these guidelines. Sec. NR 150 and PSC 2.90. In contrast, the record reveals that DILHR has never promulgated any rules or ever attempted to incorporate the guidelines.

The record and matters of which we can take judicial notice show that DILHR has had a long and sorry history of foot dragging and noncompliance with WEPA. In response to the importunings of Governor Lucey's office, the then chairman of DILHR stated that DILHR had not established any internal guidelines but expected department personnel to exercise good judgment. *See, Agency Decisionmaking under the Wisconsin Environmental Policy Act,* 77 Wisconsin Law Rev. 111, 129 n. 83. Subsequently, after the 1975 guidelines were issued by executive order, the chairman of DILHR reported to the governor that, "[I]t *would* have spent $24,000, if it had complied with WEPA." *The Implementation of WEPA: Report to Governor Lucey, November 1975, App., Summary of WEPA Manpower and Funding Questionnaire Results,* p. 2. This is a clear admission that DILHR did not conform to WEPA requirements. The fact that the

legislature did not separately fund WEPA activities does not exonerate DILHR from its duties. Other agencies found it possible to do so without special funding.

It is clear that DILHR has demonstrated prolonged recalcitrance in conforming with environmental standards. Under these circumstances, although a court should and does presume good faith on the part of an agency, it is difficult to accept DILHR's actions in respect to the instant situation as being other than a subterfuge to avoid not only the letter but the spirit of the environmental protection law.

Returning to the question of whether DILHR's purported application of WEPA standards to the promulgation of rules adequately satisfies the categorization of actions mandated by the statute and by executive order, it is apparent that it does not.

Whether we look to the rules which were originally adopted by DH&SS in 1975 or whether we look to H 63 as finally adopted in 1980, it is clear that the categorization methodology was never employed. If we look to the environmental screening worksheet utilized by the DH& SS in its 1975 revision of H 62.20, upon which DILHR says it now relies, it is readily apparent that holding tanks were not mentioned at all. As stated before, when an agency determines not to prepare an environmental impact statement, a *reviewable* record must be placed before the court. While we have a voluminous collection of irrelevant documents, there is nothing in the record to show that holding tanks were given any consideration whatsoever at that time. Moreover, the format of the environmental assessment screening worksheet used by DH&SS in 1975, upon which DILHR relies, shows that the document itself is in a form completely inappropriate to the categorization of various types of actions. It was clearly intended to apply to a single action and, as it was used by DH&SS and subsequently

by DILHR, it is completely unilluminating in respect to why an environmental impact statement was not prepared and is completely silent on whether or not holding tanks and their impact upon the environment were even thought about at the time the environmental assessment screening worksheet was prepared.

Although DILHR in its brief uses this sheet to demonstrate compliance with WEPA in the promulgation of code revisions, it rather has the effect of showing noncompliance or at least an unreasoned conclusion in respect to whether or not an environmental impact statement should be prepared. Judge Jones, in his circuit court opinion, correctly concluded that the EASW prepared at the time of code promulgation in 1975 was completely irrelevant to whether or not any holding tanks had any effect whatsoever on the environment. They simply were not mentioned.

The more recently adopted EASW prepared by DILHR when recreated H 63 was proposed in 1980 is equally devoid of any information which would suggest that DILHR made any rational attempt to conclude whether or not holding tanks should be categorized as not requiring an environmental impact statement. The lengthy statement, which purports to support DILHR's position and which was prepared in October of 1979, is devoted almost entirely to an alternate disposal system—the use of mounds. The only mention of holding tanks is in regard to comparative costs, and the study is silent in respect to any environmental impact of holding tanks. The environmental assessment screening worksheet itself, however, refers to holding tanks and, by implication, indicates that they are creating environmental problems. For example, the statement is made:

"The use of holding tanks to develop new properties is becoming quite widespread in creating problems relative to the final disposal of the waste. The proposed changes in the regulations make developments utilizing

holding tanks more difficult and places more responsibility on local government for the proper maintenance and operation of such facilities."

Although the environmental assessment screening worksheet recognizes the problems to the environment as a result of waste disposal, the document is almost entirely supported by the mound study; and apparently all holding tanks, irrespective of size, location, or geographic factors, are lumped together. The problems created by them are brushed off by the conclusion that the environmental problems created by disposal of their contents will be placed upon individual municipalities. To conclude that this study recognizes the environmental impact of a particular holding tank—or even of holding tanks as a group—and hence would obviate review of individual projects, is absurd upon its face. At the most, DILHR, and DH&SS to the extent that it was involved in the code promulgation, merely paid lip service to environmental problems and filled out a meaningless form, which counsel now would have us gullibly conclude demonstrates compliance with WEPA. It does not.

Additionally, although it is clear from *Wisconsin's Environmental Decade, supra* at 425, that a *reviewable* record is required, there is nothing in the record to review in respect to the particular holding tank or a holding tank of the size or location of that contemplated here. The conclusion of DILHR that an environmental impact statement is not required is fabricated out of whole cloth. There is nothing to show that it has ever examined any holding tank standard or code in terms of the environment and certainly there is nothing to show that this particular colossus of excrement was ever considered with the purpose of protecting the values that have been mandated by the Environmental Policy Act.

Thus, even though categorization is permissible—in fact mandatory if an EIS is not to be prepared—it is apparent that the categorization, holding tanks, now

asserted by DILHR does not in any way comport with the guidelines. Common sense dictates that holding tanks of various sizes to be located in different areas and under disparate circumstances cannot be lumped together and be the basis of the irrational conclusion that none of them is hazardous to a fragile environment. There simply was no rational application of WEPA to possible environmental standards and there was no attempt at categorization. As stated above, DILHR itself commented that holding tanks were creating environmental problems relative to the final disposal of waste but made no rational decision that could impel a subsequent conclusion that an EIS need not be prepared. Moreover, when the code, H 63.18(1), holding tank approvals, was proposed and submitted to the Assembly Resources Committee, that committee wrote to Mr. Noll, then secretary of DILHR, stating:

"We believe that this portion of the Rule should be redrafted, to establish a clear state policy that holding tanks will be approved only as a private sewage system of last resort. All units of local government and the Department of Industry, Labor and Human Relations should determine *in each case* that a conventional or an alternative private sewage system cannot be installed before permission will be granted to install a holding tank. This policy should be adhered to . . . ." (Emphasis supplied.)

When H 63.18, holding tanks, was subsequently adopted, it continued to provide: "(1) Approval. The use of holding tank installations will be considered on an individual basis. . . ."

It is apparent that the legislative committee and DILHR, when it adopted this rule, concluded that a holding tank was not to be installed merely because it comported with a plumbing code. It was not to be a mere ministerial review of laying the plans alongside of the code, but was rather to be determined on the basis of

whether it was appropriate under the circumstances. DILHR either fails to understand the meaning of its own rules or has callously endeavored to disregard them and to disregard the expressed will of the legislative committee.

I have earlier alluded to the fact that the majority has deferred, inappropriately I believe, to DILHR's interpretation of how WEPA is to be implemented. It is true, of course, that courts frequently defer to an administrative agency's interpretation of a statute when it is reasonable and is not contrary to the law or the spirit of the law. I think that what has been said above amply demonstrates DILHR's unwillingness to comply with either the letter or the spirit of the Environmental Protection Act. Moreover, the statutes applicable here are not solely within the administrative jurisdiction of DILHR. Sec. 1.11(2), Stats., makes the act applicable to *all* state agencies, and it was given to the Interagency WEPA Coordinating Committee to develop guidelines for the procedures which would facilitate administrative decision making under the law. Those guidelines, as I stated above, contemplated a reasoned categorization of actions, delineating in tiers those categories of actions which always required an EIS, those that might, and those that never would require an EIS. The PSC and DNR, in their interpretation of the law, following the guidelines, have adopted a rational categorization procedure.

DILHR's aberrant conduct, taken contrary to the generally accepted administrative construction, as exemplified by the consensus of all of the agencies represented in the WEPA committee, is entitled to no weight under the present circumstances. A department which has demonstrated an intent to avoid the WEPA guidelines and the constraints upon agency action imposed by the statute cannot be held by a rational court to have in-

terpreted its WEPA obligations reasonably. The plain meaning of the statute and the interpretative guidelines of both CEQ and the WEPA Coordinating Committee should be given primacy, and the administrative practice of other state agencies which follow the guidelines and whose compliance records are considerably better are entitled to much greater weight.

WEPA clearly poses a difficult problem for DILHR and for all state agencies, but as we have said in *Wisconsin's Environmental Decade, supra,* WEPA intended to add to the existing obligations and burdens of state agencies and its purpose is "to effect an across-the-board adjustment of priorities in the decision-making processes of agencies of state government." (p. 416) WEPA, like its national counterpart, is a statute with an extraordinarily broad sweep, and though it is qualified by the phrase, "to the fullest extent possible," this court has made it clear that the phrase sets a high standard for state agencies, which has been mandated by the legislature—a standard which will be rigorously enforced by the courts—and that phrase cannot be used as an escape hatch for a foot-dragging agency. We said in *Wisconsin's Environmental Decade, supra* at 438, relying upon *Calvert Cliffs Coordinating Committee v. AEC,* 449 F.2d 1109, 1115 (D.C. Cir. 1971):

"[Failure to comply] with WEPA to the fullest possible extent is not excused merely by considerations of administrative difficulty, expense or delay."

The Wisconsin Court of Appeals in *Wisconsin's Environmental Decade, Inc., v. DNR,* 94 Wis.2d 263, 272, 288 N.W.2d 168 (1979), stated, "[A]dministrative convenience or connivance by or with an applicant cannot be used to sidestep compliance with WEPA."

The basic proposition urged by DILHR is that, by enacting building codes, it has deprived itself of the discretion to apply environmental standards in an in-

dividual case. It suggests, but never proves, that discretionary environmental standards were applied at the building-code-promulgation stage. The record demonstrates that this assertion is false. When an agency contrives to deprive itself of a legislatively imposed discretionary responsibility, it ill behooves it to excuse its neglect of duty by the claim that only a ministerial function remains to be performed. As the guidelines demonstrate, discretion could have been exercised in an appropriate categorization process; but a hard search of the record, even when that search was made with the hope that it would reveal good faith compliance by the agency, shows that in fact discretion was not exercised. Even had there been a reasonable attempt to exercise discretion at the code-promulgation stage, it defies all rationality to conclude that all types of structures or all holding tanks could be concluded to be, in advance of plan submission, in all instances free of any detrimental environmental impact.

The argument that the exercise of discretion would infringe upon home rule reveals a misunderstanding of the home rule amendment to the Wisconsin Constitution. The Environmental Policy Act is of state-wide concern. Its implementation has been entrusted to stated agencies. It is not a matter of local concern in the sense that home rule would permit local agencies to supersede or supplant the responsibilities of the state itself.

DILHR asserts that, once a building code has been promulgated, its application is always ministerial and can never trigger agency discretion. But this assertion is not substantiated. Were all the discretionary decisions exercised reasonably at the code-promulgation stage and were those discretionary decisions at that stage truly relevant to a particular project, a mere ministerial aplication might be appropriate. As I have demonstrated, however, no substantial or reasoned discretion was exercised at the promulgation stage. Discretion must al-

ways be exercised in light of actual facts or on a hypothesis that will conform to later determined actual facts. The record does not demonstrate any exercise of discretion at code promulgation which would enable the agency or a reviewing court to say, "This is a fact situation that was clearly contemplated and a reasoned decision was made at the time of code promulgation that either an EIS was or was not required."

It should additionally be noted that the authorities cited for the proposition that building codes are always to be applied in a ministerial fashion all antedate the passage of the environmental protection laws. They do not consider whether or not environmental protection acts affect the general conclusion. The authorities cited are therefore irrelevant to DILHR's proposition.

The Washington cases cited by DILHR are, however, instructive. The ministerial assumption, which DILHR asserts is supported by a group of Washington cases, does not find support in those cases. They are indeed on point, but they indicate that the Washington Supreme Court, in construing that state's environmental protection act, reached precisely the opposite conclusion from that urged by DILHR. The Washington Supreme Court concluded that actions which in the past might have been considered as ministerial in nature became discretionary after the passage of the Environmental Protection Act. The Washington court in *Loveless v. Yantis,* 82 Wash. 2d 754, 764, 513 P.2d 1023 (1973), stated:

"Where choice exists there is discretion and the fact that previous to SEPA the choice could be solely based on narrow or limited evaluative points set forth in an ordinance or statute is immaterial. 'It is no answer to this finding of discretion in the renewal process that the department is bound and limited in its considerations to the permit renewal provisions of the Seattle code. Such a claim was raised and rejected in *Stempel* [*Stempel v. Department of Water Resources,* 82 Wash. 2d 109, 508 P.2d 166 (1973)] . . .' 82 Wn. 2d at 492 [*Eastlake*

*Com. Coun. v. Roanoke Assoc.,* 82 Wash. 2d 475, 492, 513 P.2d 36 (1973)]."

See also *Juanita Bay Valley Community Asso. v. City of Kirkland,* 9 Wash. App. 59, 73, 510 P.2d 1140 (1973), which stated:

"The change in the substantive law brought about by SEPA introduces an element of discretion into the making of decisions that were formerly ministerial, such that even if we assume, arguendo, that the issuance of a grading permit was, prior to SEPA, a ministerial, non-discretionary act, SEPA makes it legislative and discretionary."

In addition, even were we to accept DILHR's canard that plan approval is always ministerial, it has been held under EPA that ministerial action which significantly affects the environment may be considered "major action" triggering the environmental-impact-statement requirements of the national act. *See, State of South Dakota v. Andrus,* 614 F.2d 1190 (8th Cir. 1980); *N.A.A.C.P. v. Medical Center, Inc.,* 584 F.2d 619 (3rd Cir. 1978).

While CEQ and the guidelines adopted by the WEPA committee have urged categorization in order to save paperwork and the delays in adopting environmental impact statements, there are numerous cases in the United States courts which recognize that, even though there is classification, where major environmental actions may have occurred it may be appropriate for the agency to look to the specific project. In *Wisconsin's Environmental Decade, Inc.,* 79 Wis. 2d 161, 174, 255 N.W.2d 917 (1977), we have recognized the persuasive authority on cases decided under the national act. In *Calvert Cliffs Coordinating Committee v. AEC,* 449 F.2d 1109, 1115 (1971), it was stated:

"[I]f the decision was reached procedurally without individualized consideration and balancing of environ-

mental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse."

The same case stated that:

"Compliance to the *'fullest'* possible extent would seem to demand that environmental issues be considered at every important stage in the decision making process concerning a particular action—at every stage where an overall balancing of environmental and nonenvironmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs. Of course, consideration which is entirely duplicative is not necessarily required." (P. 1118)

Here, of course, action taken at the permit-granting stage is not duplicative, because, as the record demonstrates, there was never initial consideration given to a holding tank of the magnitude involved in the instant case.

In a case decided by the United States District Court for the Eastern District of Wisconsin, *State of Wisconsin v. Butz,* 389 F. Supp. 1065 (E.D. Wis. 1975), the court held that a regional environmental impact statement discussing the effect of herbicide sprays on national forests by making "only one limited reference to the National Forests in Wisconsin" (p. 1068) was insufficient compliance with the mandate of EPA and required that an injunction be issued preventing the spraying of Wisconsin forests until an EIS specifically focusing on Wisconsin had been prepared.

In *National Resources Defense Council, Inc. v. Morton,* 388 F. Supp. 829 (1974), a single overall programmatic environmental impact study was found inadequate for the Bureau of Land Management's livestock grazing program due to its failure to take into account local geographic conditions.

This court, too, has recognized that, even though there has been an overall study, by categorization, clas-

sification, or program, nevertheless there may be significant environmental effects that were not considered; and that, in such circumstances, the agency may be required to update its study or prepare a new EIS for a particular action. *See, Wisconsin's Environmental Decade, supra,* 79 Wis. 2d at 439.

It is hence very apparent that even a well thought-out generic classification, categorization, or program may not be sufficient to allow an agency to proceed with a particular action. Certainly, the procedures utilized by DILHR—and DH&SS before it—in regard to holding tanks were not demonstrably well thought out. There is nothing in them to indicate that the promulgators of the codes ever contemplated that a holding tank of the immensity of the one proposed would be approved as a ministerial matter. DILHR cannot in this case claim to have prepared a thoughtful or reasonable categorization taking into account even routine problems occasioned by the installation of holding tanks. In fact, that assertion is contrary to the very recognition of holding-tank problems described in the environmental assessment screening worksheet. I find no support in the law or in rationality for DILHR's failure to comply with WEPA in this case.

It is apparent that DILHR's approval of the plan in this case is "action" which but for the stay issued by the circuit court makes possible a major project by the James Building Corporation which might well significantly affect the environment of Door County. I would affirm the Dane County Circuit Court's order remanding the action to DILHR for the application of the appropriate standards mandated by the Wisconsin Environmental Policy Act.

I am authorized to state that Chief Justice BEILFUSS joins in this dissent.